PROVOSTY, J.
The defendants, four in number, have appealed to this court from a conviction and sentence in the First recorder’s court of the city of New Orleans for violation of Ordinance 17, as amended by Ordinance 21, of the board of health of the city of New Orleans and parish of Orleans. They were sentenced to pay- a fine of §25, or, in default of paying same, to be imprisoned for 30 days in the parish prison.
The said ordinance is the rat-proofing ordinance of the board of health. It was adopted on July 25, 1914, as a precautionary measure against the spreading of bubonic plague in the city of New Orleans. On June 27, 1914, a positive case of human bubonic plague developed in the city of New Orleans, and immediately considerable alarm prevailed, and precautionary measures were taken, consisting in the disinfection of suspected premises, the destruction of suspected material, the removal of rubbish, and the trapping of rats, which are known to be the principal conveyers of the disease. And in order that a commercial quarantine mighty not be declared against the city, and also for procuring financial assistance in the effort that would have to be made for preventing the spread of the infection and eradicating it altogether, the federal government was called on and requested to take charge of the situation; and it did so through the Public Health Service. Assistant Surgeon General W. O. Rucker, with assistants, came to New Orleans and took charge. Dr. Rucker says;
“The first thing I did was the establishment of headquarters; second, to name my staff; third, to secure legal authority under which to carry out the various necessities of the campaign ; fourth, to begin the trapping of rats, in order that the area of infection might be mapped out as rapidly as possible.”
The ordinance in question, as amended, is the legal authority here referred to by Dr. Rucker. It was prepared by him and his assistants, Drs. Creel and Simpson, in collaboration with the health officer and the attorney of the board of health. As amended it reads as follows:
An Ordinance Defining Rat-Proof Buildings. Board of Health for the Parish of Orleans and the City of New Orleans.
Ordinance No. 17, Board of Health Series, Adopted July 25, 1914, as Amended by Ordinance No. 21, Board of Health Series, Adopted Sept. 8, 1914:
An ordinance to better protect the public health, and particularly to prevent the introduction and spread of bubonic plague, by providing for the rat-proofing of all premises and buildings in the city of New Orleans.
Section 1. Be it ordained by the board of health for the parish of Orleans and the city of New Orleans, that from and after the promulgation of this ordinance, that every building, outhouse and other superstructure now *633 erected, or hereafter to be erected, in tlie- city of New Orleans, shall be rat-proofed in' the manner hereinafter provided for.
Section 2. Be it further ordained, etc.; that it shall be unlawful for any person, firm or corporation to have or maintain, or hereafter to construct any building, outhouse, or other superstructure, on any lot, open area or other premise within the city of New Orleans, unless the same shall be rat-proofed in the manner hereinafter provided for.
Section 3. (As amended by Ordinance No. 21, Board of Health Series.) Be it further ordained, etc., that for the purpose of rat-proofing all buildings, outhouses and other superstructures in the city of New Orleans, except stables, shall be divided into two classes, to wit, class A and class B; and the same shall be rat-proofed in the manner following, to wit:
Class A — All buildings, outhouses and other superstructures of class A shall have floors' made of concrete, which concrete shall • not be less than three (3) inches thick, and overlaid with a top dressing of cement, mosaic tiling, or other impermeable material, laid in cement mortar, and such floor shall rest without any intervening space between, upon the ground, or upon filling to be approved by the health officer of the city of New Orleans; said floor shall extend, and be hermetically sealed, to walls surrounding said floor, which walls shall he made of concrete, stone or brick, laid in cement and mortar, and each wall to be not less than six (6) inches thick, and shall extend into and below the surface of the surrounding ground at least two (2) feet, and shall extend not less than one (1) foot above the surface of said floor: Provided, that in certain cases, and after written permission shall have been obtained therefor from, and in a manner to be approved by the health officer of the city of New Orleans, wooden floors and wooden removable gratings may be laid upon such concrete floors, and in. certain cases, after such written permission shall have been first obtained from the health ■officer of the city of New Orleans, tar-cinder composition flooring, as hereinafter defined and provided for, may be substituted for such concrete floors. That tar-cinder flooring herein-above provided for, is hereby defined to be a composition of cinders and coal tar only, and, when laid, to be covered by a wooden floor.
The cinders used in the composition shall be free of soft ash and clinkers and shall be brought to the work dry.
The coal tar used in the composition shall be the product of the dry distillation of coal, and shall contain not more than two (2) per cent, of water, and shall be free from any mixture with other substance or thing.
The composition of, and manner of laying, tar-cinder composition flooring shall be as follows:
To each cubic yard of such cinders shall- be added twenty gallons of such coal tar, the whole to be thoroughly mixed on the work where the same is to be laid, and no other substance or thing to be added thereto. This composition shall be laid between the walls hereinabove provided for in rat-proofing building's of class A, and cover the whole space to be floored, and the whole to be thoroughly tamped or rolled, as provided for hereinafter. The sleepers to be used in the laying of such flooring shall be creosoted by having the creosote pressed into each sleeper, under a pressure of not less than fifteen pounds to the square foot, and such sleepers shall be laid in such composition before the whole of said composition is rolled or tamped; and provided further, that after such sleepers are laid in such composition, and after the whole shall be so rolled and tampered, the whole shall be not less than four inches (4") thick in its thinnest part. Upon this composition and sleepers, shall be laid a wooden flooring of the quality now provided, or hereafter to be provided for in the building laws of the city of New Orleans: Provided, however, that for the purpose of laying a tar-cinder composition floor, said wooden flooring shall be tongue and groove, well fitted, and the planks firmly set into each other, and the whole, in such manner, as to prevent the ingress or egress of rats.
Class B — All buildings, outhouses and other superstructures of class B shall be set upon pillars or underpinning of concrete, stone or brick, laid in cement mortar, such pillars, or underpinning to be not less than eighteen (18) inches high, the height to be measured from the ground level to the top of said pillars or underpinning; and the intervening space between said building and the ground level to be open on three (3) sides, and to be free from all rubbish and other rat-harboring- material: Provided that any building of class B, used exclusively for residential purposes, may be made rat-proof by constructing at the margin of the ground area of said building a wall of concrete or brick or stone laid in cement; such wall to extend into and below the surface of the ground at least two feet and to meet the floor of the building above closely and without any intervening space, such walls shall be at least six inches (6") thick and extend entirely around said building: Provided that said walls may be built with openings therein for ventilation only, and provided further, that such openings for ventilation shall be securely screened with metallic gratings having openings between said gratings of not more than one-half inch, and the whole so constructed and closed as to {irevent the entrance of rats beneath such building.
Section 4. Be it further ordained, etc., that every slaughterhouse, abattoir, market (public and private), bakery, sausage factory, rendering plant, candy factory, ice cream manufactory, hotel kitchen, restaurant kitchen, grain elevator, warehouse where grain or cereals are stored, milk depot where milk is received or stored for distribution or sales, or where milk is converted into cream cheese or other products, dairy, building wherein poultry, game, animals *635 or birds are stored or kept for sale, or sold, produce and commission houses, hide stores and other buildings wherein foodstuffs are manufactured and prepared, shall be rat-proofed in the manner provided for hereinabove as class A. All other buildings, residences, outhouses and superstructures, except stables, not hereinabove specified as class A, shall be rat-proofed in the manner provided hereinabove as class B: Provided ¡.that in plague-infected areas, or where, from any cause, a building or outhouse or other superstructure is or may become, in his opinion, a menace or dangerous to public health, the health officer of the city of New Orleans may require any such building, outhouse, or other superstructure, hereinabove required to be rat-proofed as a building of class B, to be rat-proofed as a building of class A; provided that the owner of any building, residence or superstructure in class B may rat-proof same as provided in class A if he so elects.
Stables — All buildings now, or hereafter to be constructed and used for stabling horses, mules, cows and other animals, shall be constructed as follows:
Walls — The walls of such building shall be constructed of concrete, brick or stone, laid in cement mortar, and shall be not less than sis (6) inches thick, and shall extend into and below the surface of the surrounding ground not less than two (2) feet, and shall extend above the ground a sufficient height as to be not less than one (1) foot above the floor level. All openings in such foundation walls shall be covered with metal grating having openings not greater than one-half (1-2) inch between the gratings.
Moors — The floors of stables and stalls shall be of concrete not less than three (3) inches thick, upon which shall be laid a dressing not less than one-half (1-2) inch thick of cement or stone, laid in cement mortal, in such way as to prevent ingress or egress of rats, and such floors to have a slope of one-eighth (1-8) inch per foot to the gutter drains hereinafter provided for.
Stalls — The floors of stalls may be of planking, fitting either tightly to the concrete floor, or elevated not more than one-half (1-2) inch from the stall floor, and so constructed as to be easily removable. Such removable planking shall be raised at least once a week and the said planking and the concrete floor beneath thoroughly cleansed.
Gutters — Semi-circular or Y-shaped gutter drains shall be constructed in such stables in such manner that a gutter shall be placed so as to receive all liquid matter from each stall, and each of these gutters to connect with the public sewer or with a main gutter of the same construction, which, in turn, shall be connected with the public sewer. All openings from drains into sewers shall be protected by a metal grating having openings not more than one-half (1-2) inch between the gratings.
Manure Pit — Each stable shall .be provided with a manure pit to be sunk into the ground within or near to said stable which pit shall be lined with cement so as to make same liquid tight, and having a capacity of at least two and one-half cubic feet for each stall in said stable. Said manure pit shall be provided with, a tight fitted cover, divided into two parts, and so constructed as to render the contents of said pit inaccessible to flies.
Manure — Any manure in and about all stables shall be placed in said manure pit at least once a day. Manure shall be removed from said pit at least twice a week between March 15th and December 1st, and at least once a week between December 1st and March 15th. All manure so removed shall be placed in wagons so protected as to render said manure inaccessible to flies.
Mangers — Each manger shall be constructed so as to have a slope of two (2) inches towards the bottom, shall be covered with tin or zinc and shall be at least eighteen (18) inches deep to avoid spilling of food.
Feed bins — All feed bins shall be constructed of cement, stone, metal or wood, and with close-fitting doors. If constructed of wood the bins shall be lined or covered with metal, and the whole so constructed as to prevent the ingress or egress of rats. All grain, malt and other animal food, except hay, stored or kept in any stable must be kept ra such feed bins. Said feed bins must be kept closed at all times except when momentarily opened to take food therefrom, or when same are being filled. No feed shall be scattered about such bin or stable and all such feed found on the floor or in the stalls of said stables shall be removed daily and placed in the manure pits. No foodstuffs intended for or susceptible of human consumption shall be kept or stored in any stable or any other place where animals are kept.
Section 5. Be it further ordained, etc., that the construction and materials used in rat-proofing shall conform to the building ordinances of the city of New Orleans, except and only in so far as the same may be modified herein.
Section 6. Be it further ordained, etc., that all wall space, accidental and unnecessary spaces and holes, ventilators and other openings other than doors and windows in every building, outhouse and other superstructure' in the city of New Orleans shall be closed with cement or screened with wire having not less than one-half (1-2) inch mesh, as the case may require, in such manner as to prevent the ingress or egress of rats: Provided that in all buildings, outhouses and other superstructures of class .A, and in all stables, where there are-. any spaces in walls between the wall proper and the covering on same, or in ceilings, between the ceiling and floor, or other ceiling covering above said spaces shall be eliminated by the removal of said covering, or so closed as to prevent the ingress or egress of rats, and the whole, as determined and in such manner as shall be approved by the health officer of the city of New Orleans.
*637 Section 7. Be it further ordained, etc.., that all premises, improved and unimproved, in the city of New Orleans, and all open lots and areas, shall be kept clean and free from • all rubbish and similar loose material that might serve as a harborage for rats, and all lumber, boxes, barrels, loose iron and similar material that may be permitted to remain on such' premises, and that may be used as a harborage by rats, shall be placed on supports and elevated not less than two (2) feet from the ground, with a clear intervening space beneath to prevent the harboring of rats.
Section 8. Be it further ordained, etc., that all planking and plank walks on and in yards, alleys, alleyways, or other open areas, shall be removed and replaced with concrete, brick or stone, laid in cement, gravel or cinders, or the ground left bare.
Section 9. Be it further ordained, etc,,, that all rat-proofing done under the provisions of this ordinance shall be approved by the health officer of the city of New Orleans.
Section 10. Be it further ordained, etc., that it shall be the duty of every owner, agent and occupant of eac-h premise in the city of New Orleans to comply with all the provisions of this ordinance.
Section 11. Be it further ordained, etc., that each day’s violation of any provision of this ordinance shall constitute a separate and distinct offense.
Section 12. Be it further ordained, etc., that any person violating any provision of this ordinance shall on 'conviction be punished by a fine of not less than ten dollars nor more than twenty-five dollars, or in default of the . payment of such fine, by imprisonment in the parish jail for not less than ten days nor more than thirty days or both, at the discretion of the recorder having jurisdiction of the same.
Section 13. Be is further ordained, etc.,‘that any law or ordinance in conflict with the provisions of this ordinance, in whole or in part, be and the same is hereby repealed.
Adopted by the board of health, September 8, 1914.
W. H. Robin, M. D.,
Secretary of the Board.
Approved September 10, 1914.
W. T. O’Reilly, M. D.,
Superintendent of Public Health.
A true copy:
W. H. Robin, M. D.,
Secretary of the Board of Health.
The prosecution is by affidavit, which charges the defendants with having violated Ordinance 17 of the board of health of the parish of Orleans and city of New Orleans “all against the peace and dignity of the city of New Orleans.”
The said board of health is created by section 18 of the charter of the city of New Orleans, which is Act 159, p. 253, of 1912, and its powers are defined by section 19 of the •same act, which provides that:
Its “powers, duties and rights * * * shall be and remain the same, as those of municipal ,and parish boards of health, as prescribed by Act 192 of 1898.”
The latter act was amended by Act 173, p. 313, of 1912, and, as amended, reads:
“That said parish and municipal boards of health shall have power and authority to pass health and sanitary ordinances for. defining and abating nuisances dangerous to the public health; to regulate drainage and ventilation with reference to human habitation and places .of business and public resort; to regulate the "carrying on of trade and business injurious to public health; for the disposition of fcecal matter and garbage; to regulate the erection of buildings; * * * for the vacation or de'molishing of buildings when necessary for the protection of public health; for the registration of births, deaths and marriages, and the keeping of vital statistics to be registered and reported to the state board of health under its instructions and regulations, and generally all health and sanitary ordinances necessary and incident to the proper local sanitation of the parish, city or town in which they exercise their powers.”
The said statute adds:
“Any person violating any provision of any ordinance of said parish and municipal board of health, shall, on conviction by any court of competent jurisdiction, be fined not less than ten nor more than twenty-five dollars, or suffer imprisonment in the parish prison for not more than thirty days, or both at the discretion of the court.”
The accused excepted to the jurisdiction of the recorder’s court, contending that this prosecution, while purporting to be for a violation of the said ordinance of the board of health, is in reality for a violation of the said Act 192, p. 437, of 1898, as amended, and that the said recorder’s court under the law of its creation (article 141 of the Constitution) has jurisdiction only of violations of ordinances of the city of New Orleans.
The accused also assailed the validity of the said ordinance on numerous grounds.
[1] This court has no jurisdiction on this appeal of the question of the jurisdiction vel non of the recorder’s court, but has juris *639 diction only of the question of the legality of the fine which has been imposed by the judgment appealed from. City of New Orleans v. Williams, 134 La. 421, 64 South. 229. This question of jurisdiction has been considered by this court in the case of City of New Orleans v. Mrs. Stein, 69 South. 43,[1] No. 21385, this day decided, where a similar plea to the jurisdiction of the recorder’s court was sustained.
[2] The first ground of invalidity relied on by the accused is that the proper authority to have legislated upon the subject-matter of this ordinance was the commission council of the city of New Orleans; that the board of health was without authority to do so. In support of that contention the learned counsel of accused call attention to sections 4 (B), 6, 12, and 70 of the City Charter (Act 159, p. 253, of 1912).
Section 4 (B) provides as follows:
“The commission council shall have and possess * * * all executive, legislative, and other powers and duties now had and possessed and exercised by the mayor, * * * the city council, * * * the comptroller-, * * the treasurer, * ‡ * the commissioner of public works, * * * the commissioner of police and public buildings, * * * and the city engineer, of the city of New Orleans. The commission council shall also have and possess, and shall exercise all executive, legislative and other powers and duties heretofore had and possessed and exercised by all other legislative, executive and administrative officers of the city of New Orleans, whether herein specifically enumerated or not; the intention being that the entire powers and duties of government of the city of New Orleans, as at present vested or as may be hereafter vested by the Constitution and laws of this state, in the municipal officers of said city, shall be concentrated in the commission council.
“The executive and administrative powers, authority and duties in said city, shall be distributed among the five departments as follows, to wit:
* * «
“2. * * *
“3. The department of public safety.
“4. * * *
* * S:
“The commission council shall at their first meeting determine the powers and duties to be embraced in each department unless herein otherwise provided. * * * ”
Section 12 provides as follows:
“The following subdivisions of government shall be grouped under the five departments herein provided for in the manner indicated below, to wit:
“Under the department of public safety:
“1. Eire prevention and relief.
“2. Police.
“3. Health. * * *”
Section 6 provides as follows:
“Sec. 6. The commission council shall have the power, and it shall be their duty, to pass such ordinances, and to see to their faithful execution, as may be necessary and proper:
“1. To preserve the peace and good order of the city.
“2. To maintain its cleanliness and health, and to this end:
“(a) To adopt and provide an efficient system of drainage.
“(b) To provide for the inspection, and cleanliness of all vaults, privies, yards, pools, markets, cemeteries.
“(c) To regulate the location of and inspection and cleansing of dairies, stables, cattle yards, landings and pens, slaughter houses,, soap, glue, tallow and leather faetoides, depositories for hides, blacksmith shops, forges, foundries, laundries, oyster shops, and all places of business likely to be or become detrimental to health or comfort, and to adopt such oi'dinances and regulations as shall be necessary or expedient for the protection of health and to prevent the spread of disease, and to maintain a good sanitary condition in the streets, public places and buildings, and on all private premises.
“The commission council shall provide for the frequent inspection of all premises by persons to be designated either by the commission council or by the board of health in the city; they shall also prescribe what water supply shall be provided by the owners of private premises, and that all premises, yards, streets and alleys shall be kept in a cleanly condition; shall provide for the punishment of any violation, by fine or imprisonment, or both; and all such fines, when recovered, shall be paid over to the boaxd of health, to assist in its maintenance.”
Section 70 provides:
“That all laws or pai’ts of laws in conflict herewith be, and they hereby aie, repealed: Provided that all laws upon the same subject-matter not inconsistent herewith shall remain in full force and effect, and all the provisions of the Act 192 of 1898, 89 of 1900, 32 of 1902, 32 of 1904 56 of 1908, 33 of 1910, 58 of 1910, and 128 of 1910, with all amendments thereto, if any, not repugnant to or inconsistent with the terms of this act, are continued in full *641 force and effect, and the commission council herein organized and provided for is especially authorized and vested with all the powers, duties, functions and privileges granted and provided for under the terms and provisions of the aforesaid acts.”
It will he noted that, while section 19, of the charter provides that the “powers, duties and rights of the board of health for the parish of Orleans and city of New Orleans shall be and remain the same as those of municipal and parish boards of health,” as prescribed by Act 192 of 1898, as amended by Act 173 of 1912, transcribed at page 38 of this opinion, section 70 provides that “the commission council herein organized and provided for is especially authorized and vested with all the powers, duties, functions and privileges granted and provided for under the terms and provisions of the aforesaid act”; and that section 4 (B) provides that the commission council shall possess and exercise all the executive, legislative, and other powers and duties heretofore had and possessed by all the executive, legislative and administrative officers of the city of New Orleans, “the intention being that the entire powers and duties of government of the city of New Orleans, as at present vested or as may be hereafter vested * * * in the municipal officers of said city, shall be concentrated in the commission council”; and that by section 12 the subdivision of the government having jurisdiction over matters relating to the public health is assigned to the department of the public safety; and that by section 6'it is provided that “the commission council shall have the power and it shall be its duty to pass such ordinances” as may be necessary to maintain the cleanliness and health of the city, and to that end to adopt such ordinanc-_ es and regulations as shall be necessary or expedient for the protection of health and prevent the spread of disease.
It is evident that the different provisions, thus quoted from practically the same statute, grant authority to both the board of-health and the commission council of New Orleans to enact ordinances covering the same subject-matter; but, as no conflict in the exercise of that authority is presented in this case, it is unnecessary that any opinion should be here expressed as to the outcome of such possible conflict. The court assumes that the General Assembly intended to make the‘grants as declared in the statute. There is reason enough beyond the fact that the grants were made to warrant the assumption. And it is no part of the duty of the court to defeat that intention by placing upon the statute a construction not absolutely necessary.
[3] One of the consequences of the grants as made is that the same act may be prosecuted as an offense against the state, in a state court, and as an offense against the municipality in a municipal court. For, as was held in the case of City of New Orleans v. Mrs. A. Stein, 69 South. 43, 2 No. 21385, this day decided, the offense of violating a statute (by violating an ordinance of the board of health) is created by the act of 1898 (amended by Act 173 of 1912), which alone provided the penalty therefor, and that offense must be prosecuted in a state court, since the municipal courts are without jurisdiction ; whereas, the commission council may provide a penalty for violation of an ordinance enacted by it, thereby creating the offense of violating a municipal ordinance, of which, under article 141 of the Oonstitution and section 21 of Act 159 of 1912 (the city charter), the municipal courts have jurisdiction.
[4] We pass to the next alleged ground of invalidity. The ordinance provides that:
' “From and after the promulgation of this ordinance every building, outhouse and other superstructure now erected, or hereafter to be erected, in the city of New Orleans, shall be rat-proofed in the manner hereinafter provided;” and (section 10) “it shall be the duty of every owner, agent and occupant • of each premise in *643 the city of New Orleans to comply with all the provisions of this ordinance;” and (section 11) “that each day’s violation of any provision of this ordinance shall constitute a separate and distinct offense,” punishable by a fine of $25 or 30 days’ imprisonment or both.
So that on reading their morning paper containing the promulgation of this ordinance the 270,000 inhabitants.of the city of New Orleans learned that until they had rat-proofed the structures they lived in and owned they were liable to a separate fine of $25 and a separate sentence of 30 days in prison for every day they continued to live in or own said structures. It stands to reason that the peaceful homes and business places of the inhabitants of this large city, constructed in conformity with the rules and regulations theretofore prescribed by the public authorities, could not be thus, overnight, by a strobe of the pen, converted into unlawful structures.
A palliation of this altogether arbitrary provision is sought to be derived from the alleged fact that the ordinance has not been enforced in its strictness as written, but that notice and time have been given to the property owners to avoid punishment by compliance. But a statute or ordinance which is on its face null cannot be saved from nullity by not being enforced as written, but given an operation which would save it from nullity. Under the terms of this ordinance, prosecutions might he instituted at dnce, and every single day subject the property owner to an additional prosecution. The validity of a law must depend upon its terms, and not upon the condescension or consideration of the officers of the law in not enforcing it.
Much freedom of action must be allowed to the police power in the measures which it may deem necessary or advisable to take in the interest of the public safety; and if this rat-proofing were a small matter, such as might be attended to from one day to another and at no very great expense, such a law might perhaps be justifiable. But this rat-proofing affects practically every house in New Orleans. To some of the owners it means partial reconstruction; to others rehabilitation almost as expensive as rebuilding. To all it means a heavy expense. As to a great many premises it means simply demolition and clearing away of materials. Dr. Rucker makes a rough estimate of $2,000,000 for classes A and B. In a great many instances the expenses, to use the expression of Dr. White, would be “terrific.” In the case ot groceries, for instance, the building could not rest on pillars, as nine-tenths of them do at present, but on a solid or continuous wall extending at least two feet below ground and one foot above, and the lower floor of the entire building would have to be on the ground and concreted. All houses the bottom of whose sills was less than 18 inches above the ground, would have to be raised to that height, involving necessarily the readjustment of all plumbing, electrical and gas connections, and masonry. The plaster or interior of the wall and ceiling of the lower story of most of the houses would have to be torn down.
[5] The learned counsel for accused violently assail this ordinance on the ground of its unreasonableness; that whereas it professes to be a measure for protection against rats by destroying their harboring places, it is, in the nature of things, inoperative as against the federal government buildings and structures, the state government buildings and structures, including the wharves, which are admittedly the main source of danger, and including, also, the garbage dumps, which are admittedly the common resort of rats; that, as a matter of fact, the city is not rat-proofing these most dangerous foci of infection, the alleged excuse being that there are no funds available for the work, so that the operation of the ordinance is to compel the property owner to rat-proof his premises, whether he or she has the funds to do it *645 with or not, while those public foci of infection, the most dangerous, are left in full, o.p-, eration, scattered as they are throughout the city; that this shutting of one.door against the rats while leaving another and wider door open is an unreasonable exercise of the police power, especially when the closing of the one door is attended with so great expense, and in mqny cases at so great personal sacrifice.
There is unquestionably great force in this argument. A police measure dictated by some evil to be remedied should be .commensurate with the necessities of the occasion. Where the same feature which operates as a public menace is present in all premises alike, the police measure for correcting this feature should operate as against all premises alike, or else against none. And the public is no exception to this rule. For instance, if for staying the progress of a conflagration it became necessary to tear down-a building, the fact that it was a public building would not stay the hand of the fire department.
But if, as the evidence in this ease shows, this rat-proofing, coupled with rat-catching, was the only practical mode of fighting the spread of this disease, and if, as is the case., the board of health was powerless -to make_ this mode compulsory either against the federal, the state, or the city government, what was it to do? Was it to do nothing, or was. it to do the best it could; or, in other words, go as far as the circumstances allowed it to go? We must answer that question in. the affirmative. However oppressive, however discriminating, however unreasonable this ordinance apparently may be, there was' nothing else for the board of health to do, under the circumstances, than to adopt it; and hence the adoption of it was justified." “Salus populi suprema lex.”
[6, 7] The next assigned ground of invalidity of this ordinance is that it delegates to an officer a discretion which is confided by the statute to the board of health itself, and 'can be exercised only by the board itself, and cannot be delegated.
It is argiied that, conceding that the board 'of health may establish classes and impose special requirements upon each class and exact conformance with them, it cannot leave to the discretion of the health officer to determine whether a building which under the terms of the ordinance would belong to one class shall not be transferred to the other class, or, in other words, whether a building which under the terms of the ordinance would have to be tar-cindered shall not have to be concreted, and that it cannot leave to the discretion of the health officer to allow class A buildings to be tar-cindered, instead of concreted, thereby practically transferring them from the one class into the other, and that this discretion as to transferring from class B to class A is Confided to said health officer by the provision of section 4 declaring that “where, from any cause, a building or outhouse or other superstructure is or may become, in his opinion, a menace or dangerous to public health, the health officer of the city of New Orleans may require any such building, outhouse or other superstructures hereinabove required to be rat-proofed as a building of class B to be rat-proofed as a building of class A,” and that the discretion to transfer a building from class A to class B is conferred upon said health officer 'by the provision of section 3 of the ordinance, reading:
“Provided, that in certain cases and after written permission shall have been obtained therefor from and in a manner to be approved by the health officer of the city of New Orleans, wooden floors and wooden removable grating may be laid upon such concrete floors; and in certain cases after such written permission shall have been first obtained from the health officei of the city of New Orleans, tar cinder composition floors as hereinafter defined and provided for may he substituted for such concrete floors. That tar-cinder flooring hereinafter provided for is hereby defined to be a composition of cinders and coal tar only, and when laid to be covered by a wooden floor.”
*647 The general principle underlying this contention is that a delegated power cannot he delegated — a principle variously expressed in the Latin maxims, “Delegata potestas non potest delegari,” “Vicarius non habet vicar-um,” “Delegatus non.' potest delegare,” and “Delegata potestas non est deleganda.” Broom’s Legal Maxims, § 386; 13 Cyc. 769; 28 Cyc. 276. In governmental matters it has not been found possible, as a practical question, to adhere rigidly to the principle expressed by these maxims. It has been found necessary, as a practical question, that the powers of legislation which the people have delegated to the Legislature should be redelegated to municipalities and other local bodies and functionaries for purposes of local government and administration; and these local bodies have been allowed to redelegate to subordinates such of their functions as could not possibly in the nature of things be exercised by themselves, but which necessarily have to be confided to some subordinate.
The law on this subject is very fully and very clearly stated in 28 Cyc. 276, and reference is there made to the cases. A review of these cases here would serve no useful purpose. Their general result is well stated by Cyc. as follows:
“Since all governmental power is held in trust by the state for the benefit of the public, it has been generally denied that such power can be delegated by the state to anybody. But repeated adjudication has settled that the maxim ‘Potestas delegata non est deleganda’ does not preclude the Legislature from conferring sovereign powers on municipalities in such measure as to it seems wise and proper. More important and difficult is it now to ascertain whether the governing body of the municipality may delegate its powers to another, and, if so, which powers, and to what extent delegation may be made by the council. It has repeatedly been held that the municipality had no such power of delegation. But it is now the recognized rule that the state may expressly authorize delegation of certain powers by the corporation. In the absence of such express authority, the council must itself exercise all discretionary powers; but this does not forbid the delegation of ministerial or administrative functions to subordinate officials.”
In support of this, our own decision in State v. Garibaldi, 44 La. Ann. 809, 11 South. 36, is cited, where it was held that, while the city council was at liberty to mate all such rules and regulations as in its wisdom or discretion it deemed necessary for the keeping of private markets, it could not impose the condition that a person desiring to keep such a market should obtain the consent of a majority of the property owners of the neighborhood. “The authority,” said the court, “cannot be delegated to a majority of property owners of a locality.” Abundant authority is cited.
In City of New Orleans v. Smythe, 116 La. 685, 41 South. 33, where the consent of the property holders within 300 feet of the location of a saloon proposed to be established was required, the court distinguished the case from this Garibaldi Case by observing that in the latter case “the Legislature had not delegated to the city the power to delegate to property holders the right to control the establishment of private markets.” The present Chief Justice dissented altogether from the opinion. The then Chief Justice and the present writer concurred only in the decree, preferring to rest their decision on the peculiarly exceptional character of the liquor traffic.
In City v. Macheca, 112 La. 559, 36 South590, the same ordinance was upheld on this last ground; and in City of Baton Rouge v. Butler, 118 La. 74, 42 South. 650, a similar ordinance was maintained on this same latter ground, in the absence of any provision in the city charter for consulting adjoining property holders.
In State v. Zurich, 49 La. Ann. 447, 21 South. 977, the court sustained the contention of the defendant, which is stated at bottom of page 452, 21 South. 979, as follows:
“He contends that, while it may be perfectly legitimate for the city to pass regulations on the subject of certain buildings within its borders, and devolve upon a particular officer the duty of seeing that the regulations made by *649 the city are conformed to, Ms duty could' not be made to extend beyond ascertaining whether buildings or alterations thereto, proposed to be made, would be in violation of ordinances, or those actually erected were so violatiyé, and to institute civil legal proceedings against the parties, either by way of prevention or remedy. He contends that the city has no authority to appoint a city official, and to delegate to him the power of primarily determining whether the owners of property should be permitted to exercise their property rights or not, under penalty of a criminal prosecution.”
We have not the time to review all the decisions of this court on this point, and it is not necessary to do so, since the doctrine of the Garibaldi and Zurich Oases, supra, has never been departed from.
Our conclusion is that while the board of health, or the city council, may validly, clothe the health officer with the authority to ascertain and determine whether any particular building falls into the one class or the other (City v. Charouleau, 121 La. 890, 46 South. 911, 18 L. R. A. [N. S.] 368, 126 Am. St. Rep. 332, 15 Ann. Cas. 46) it cannot invest him with the authority to withdraw any particular building from the one class and place it in the other. If it so happened that, because of special circumstances, any, exceptions had to be made to the rule established by the ordinance, the discretion for making it would have to be exercised'by the same power that made the rules, and.could not be delegated to a subordinate. The board of health could not delegate to- a subordinate the power to create exceptions to any rule it had established, or, which is the same thing, the power to stay the operation of any rule in cases falling within the terms of its ordinances.
So far as the faculty is conferred upon the health officer to transfer a building' from class B to class A, or, in other words, to make the condition of the owner of the building more onerous, we do not see that any one would be in a position to complain, except the person whose building had been thus transferred. “It is a firmly established principle of law that no one can be allowed to attack a statute as unconstitutional who has no interest in it and is not affected by its provisions.” 8 Cyc. 786. “Only those whose rights would be prejudiced by the enforcement of an unconstitutional act will be heard to question its validity.” 6 A. & E. E. of L. 1090. If an owner is made by the health officer to incur the greater expense of concreting his building, instead of tar-cindering it, or, in other words, to adopt the costlier and safer mode of rat-proofing, this particular owner may complain, but not any one else.
But the case stands differently where this health officer is authorized in his discretion to allow an owner whose building falls in class A according to the terms of the ordinance, and must therefore be concreted, to merely tar-cinder the building as if falling in class B under the ordinance. The effect of this discretion is to leave it optional with the health officer whether the ordinance shall be enforced or not according to its terms against persons whose buildings fall in class A. The favorites of the officer might be allowed to tar-cinder, while all others would have to concrete.
Such a delegation of power is, it is needless to say, null; and the sole question must be whether its nullity entails the nullity of the ordinance.
We are constrained to hold that it does. A law which discriminates between individuals of the same class is null; and a law does so discriminate when it leaves to the discretion of an officer to exempt from its operations particular individuals belonging to the class .upon which according to its terms it operates. Argument can hardly be necessary to make evident that a law which provides that all buildings answering a certain description shall be rat-proofed by concreting, ex *651 cept those which the health officer shall in his discretion allow to be rat-proofed in a less expensive way, is null. In last analysis it has no other sanction than the discretion of the officer whether it shall or not have operation ; in other words, whether it shall or not he a law. And such a law injures or prejudices every individual of the class, since it allows the health officer to discriminate against him in favor of his neighbors in the same class with him. 'The situation is not that the clause delegating the discretion to the officer is null and the rest of the ordinance is left standing; the effect of the clause is to leave optional with the officer whether the ordinance shall be enforced or not against all the individuals alike in class A. In other words, it is to rob the ordinance of its binding force.
And the nullity of the ordinance in so far as applicable to class A entails its nullity in so far as applicable to class B; for the effect of the nullity is to create a situation in which as to class A buildings there is only a null ordinance, or, in other words, no ordinance at all; and it is needless to say that this ordinance would never have been passed as applicable to class B buildings only. As applicable to class B buildings only, it would fail of its object, and be in fact a mere travesty of a health measure.
Other grounds of nullity are argued by the accused, which we. deem it unnecessary to notice, further than to say that we have found them to be without merit.
It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside, and that the demurrer herein be sustained, and the prosecution dismissed, at the cost of the board of health.
O’NIELL, J., concurs in the decree.
See dissenting opinion of LAND, J., 69 South. 43.

 Post, p. 652.

 Post, p. 652.