Illinois Power & Light Corporation, Appellant, v. Consolidated Coal Company of St. Louis and Consol Power Company, Appellees.

Gen. No. 8,233.

April term, 1928. Heard in this court at the Opinion filed October 15 ,1928.

T. K. RINAKER, JESSE PEEBLES and DRYER & BROWN, for appellant.

GEORGE B. GILLESPIE, ALEXANDER H. BELL and WHITNEL & BROWNING, for appellees.

PAUL J. LUKER, MURPHY & HEMPHILL, L. M. HARLAN and E. D. GEORGE, *amici curiae*.

MR. JUSTICE ELDREDGE delivered the opinion of the court.

Appellant filed its bill in equity in the circuit court of Macoupin county to enjoin appellees, and each of them, from constructing and from completing the construction of certain transmission lines from the city of Staunton to the village of Williamson and the village of Livingston, from rendering electric service to the villages of White City, Mount Olive, Williamson and Livingston and to the city of Staunton and to all the industries in, around and between said city and villages and to the individuals living in and around and between the same and from soliciting the right to render electric service for light, heat and power purposes from said city and villages, industries and individuals, from meddling with the rights of appellant to render such service and from inciting disturbances against the rights of appellant in said territory where it has a right to serve unmolested, subject to the Illinois Commerce Commission Act, Cahill's St. ch. 111a, ¶16 *et seq.*, in relation to rates and character of service in said territories. A temporary injunction was issued restraining appellees from constructing and completing the construction of an electric transmission line from the city of Staunton to the village of Williamson and to the village of Livingston or from said city to said villages or from one of said villages to the other of said villages. A demurrer was filed by appellees to the bill and sustained. By leave of court, appellant filed an amendment to the bill and a demurrer to the amended bill was also sustained, whereupon, appellant, abiding by its bill, the same was dismissed by the chancellor for want of equity. To reverse the decree sustaining the demurrer to the amended bill and dis-

missing the same for want of equity this appeal is prosecuted.

It is averred in the bill, in substance, that appellant is a corporation organized under the laws of this State and that, by its charter, is authorized to construct, purchase, own and operate throughout the State electric light and power plants with transmission lines and distribution systems extending therefrom and to manufacture and purchase electric current and transmit the same from said lines and sell or dispose of it at wholesale or retail to any and all customers residing within the state; that it was organized June 19, 1923, by a merger or consolidation of the Southern Illinois Light and Power Company, a public utility, with several other public utilities known as the McKinley interests, with the charter power and right to conduct a public utility business for the manufacture, purchase and sale of electric current to the public, and that said corporations so acquired were all possessed of the franchises, rights, privileges and certificates of convenience and necessity required for conducting said business at the places hereinafter mentioned; that the said Illinois Light and Power Company had for more than seven years prior to said consolidation owned and possessed large electric power plants located in the cities of Hillsboro, Litchfield, Gillespie, Collinsville and Greenville and had been operating said transmission lines extending from each of said cities and connecting each and all of said power plants together; that the Southern Illinois Light and Power Company had owned and operated other transmission lines extending from each of said cities to the villages and towns surrounding the same for a distance of several miles; that one of such lines extended from the city of Gillespie to the city of Benld and from there to the city of Sawyerville, over which it had furnished electric current to the cities of Benld and Sawyerville for a long time prior to said merger

or consolidation; that prior to the time of the incorpo-
ration of appellant, and prior to the incorporation of
the defendant Consol Power Company, the said South-
ern Illinois Light and Power Company had applied for
and obtained permission from the Illinois Commerce
Commission to extend its electric transmission line from
its then terminus about one-half a mile south of Sawyer-
ville in an easterly and southeasterly direction along
the south side of the village of White City, to within
about one-half mile of the corporate limits of the vil-
lage of Mount Olive and thence in a southerly direction
and passing within three quarters of a mile of the
corporate limits of the city of Staunton to the Mount
Olive-Staunton Coal Company, located near the west
side of the limits of the city of Livingston, for the pur-
pose of furnishing electric light and power service to
the said Mount Olive-Staunton Coal Company; that the
said McKinley interests, before the consolidation, con-
sisted of the Illinois Traction System, incorporated
under the Railroad Act of Illinois, Cahill's St. ch. 114,
and engaged in carrying passengers and freight for
hire by means of electric power from large electric
light and power plants and conveyed from transmission
lines along and over its right-of-way, from the city of
Venice to the cities of Granite City, Edwardsville, and
other divers villages and towns and said city of
Staunton and thence through said village of Sawyer-
ville, the cities of Benld, Gillespie and divers other
cities and villages to the city of Springfield and other
places; that said Illinois Traction System was also
possessed of another electric line extending from the
city of Staunton through the village of Mount Olive and
on to the cities of Litchfield and Hillsboro; that prior
to said consolidation the Illinois Traction System
owned the stock of several subsidiary corporations, or-
ganized for the purpose of conducting the public utility
business and owning and possessing electric light and

power plants and manufacturing, purchasing and selling electric current to the public in the cities of Venice, Granite City, Edwardsville, Carlinville and other places and had for many years furnished electric current to said cities and the inhabitants thereof, which said current had been purchased, in part, by said subsidiary corporations from the Illinois Traction System and by them distributed and sold to said cities and the inhabitants thereof; that said Illinois Traction System had, at each and all of said cities through which said electric line extended, maintained substations and transformers for reducing electric current to a voltage suitable and proper for furnishing electric power and light to all of said cities;

That said Illinois Traction System and its subsidiaries had for many years prior to said consolidation owned a transmission line extending from said Traction System line to the villages of Williamson and Livingston and for many years had furnished and sold electric current to a corporation then engaged in distributing the same to said villages of Williamson and Livingston and their inhabitants, which said distribution system was later sold to said municipalities and said Traction System continued to supply current thereto, until the time of said merger;

That said Southern Illinois Light and Power Company and the Illinois Traction System and all of said subsidiaries had at all times since the passage of the Public Utilities Act, Cahill's St. ch. 111a, and the act known as the Illinois Commerce Commission Act, obtained all certificates of convenience and necessity required for carrying on the business in which each of said corporations had been, from time to time, engaged and had filed with said commission a schedule of rates and charges which had been approved as filed and had, during all of said time prior to said merger, complied with all the orders, rules and regulations of said

respective commissions in conducting the business in which each of said corporations had been engaged; that at the time of said consolidation and merger, appellant became the owner of all the property, real and personal, rights, privileges, franchises and certificates of convenience and necessity of the Southern Illinois Light and Power Company and of all capital stock of said Illinois Traction System and of all the subsidiary corporations then owned by said Traction System and became the owner of all the property, real and personal, and of all the rights, privileges, franchises and certificates of convenience and necessity of all the subsidiary corporations of said Traction System, and that said consolidation and merger aforesaid was approved by the Illinois Commerce Commission;

That said transmission lines authorized by the Illinois Commerce Commission to be constructed by the said Southern Illinois Light and Power Company shortly prior to the said merger were within two months thereof fully constructed and ready to render electric service in the territory through which they extended; that said Southern Illinois Light and Power Company was, prior to the time of said merger, possessed of ample modern plants, machinery, equipment and supplies to render adequate electric service to the cities, villages and towns through which its lines extended and to the inhabitants thereof, and that said Illinois Traction System and its subsidiary corporations were, at all times prior to said merger, possessed of ample modern plants, machinery, equipment and supplies to render adequate electric service to the cities, villages and towns through which its lines extended and to the inhabitants thereof; that by reason of said merger it became possible to connect all the transmission systems of the consolidated corporations and their subsidiaries, which, before the said merger, were, at all times, willing and able to serve the city

of Staunton, Mount Olive, White City, and the villages of Williamson and Livingston and divers industries and persons living in and between and near said cities and villages, with electric light and power service and that since said merger appellant has been, at all times, ready, willing and able to serve said cities, industries and individuals in the same manner;

That the appellee Consolidated Coal Company of St. Louis, prior to the time of said merger, had become the owner of a vast acreage of coal lands situated near and around the municipalities of Staunton, Mount Olive, Livingston, White City, and elsewhere in the counties of Macoupin and Madison, and, before the termination of the World War and several years prior to said merger, had constructed a large coal mine in the village of White City, and for the purpose of furnishing electric power for hoisting the coal therefrom from its mine No. 7 and its mine No. 14, and for the purpose of furnishing light and power to other mines which the coal company then contemplated sinking and operating at the time said electric light and power plant was constructed at its mine No. 15, which was capable of producing a larger amount of current than was required for the operating of its mines Nos. 15, 7 and 14 and was constructed with the expectation of requiring the full capacity when the additional mines should be sunk, but which additional mines had never been sunk and said coal company has now abandoned the idea of ever sinking more mines and by reason thereof is attempting to make a return on its over-investment made by it in the coal business by disposing of the excess current generated by its said plant;

That prior to said merger, said coal company had not engaged in the manufacture or sale of electric current, but that immediately thereafter, and after it became rumored about that appellant was better equipped than ever before for the purpose of rendering electric service throughout the territory of White City,

Mount Olive, Staunton, Williamson, Livingston and the intervening territory and the other places throughout which it operated, the officers of the coal company applied for and obtained a charter in the name of the Consol Power Company, authorizing it to manufacture, purchase, acquire, sell and dispose of electric current and conduct a general public utility business and that said officers and agents of said coal company, in the name of the Consol Power Company, filed a petition with the Illinois Commerce Commission requesting that it, the said Consol Power Company, when incorporated, be permitted to conduct a general public utility business and more especially to manufacture, purchase and acquire electric current and sell and dispose of the same to the cities, villages and towns and inhabitants thereof in the counties of Macoupin and Madison;

That the stock of the Consol Power Company, with the exception of a few shares owned by the officers of the coal company, is all owned by the coal company; that although said coal company was not possessed of the charter powers for rendering the public service and furnishing light, heat and power as aforesaid, and was possessed of no certificate of convenience and necessity to conduct such business, yet it, immediately after the merger aforesaid and before the Consol Power Company had obtained a charter authorizing it to do business, and before a certificate of convenience and necessity had been obtained by said Consol Power Company, began to solicit light and power contracts from the villages of White City, Mount Olive, Williamson, Livingston and the city of Staunton and from divers coal mines, brickyards and other industries, and also began to solicit for the disposition of electric current to divers persons living between the cities, villages and towns aforesaid, and threatened and intimidated the same into the making of many such contracts

through the threat of closing all its said mines unless said cities, villages, towns and industries aforesaid, would enter into lighting contracts authorizing the Consol Power Company to furnish light, heat and power to the same and said coal company unlawfully furnished electric service and is still furnishing electric service to a great many persons living north and east of the city of Staunton under a void certificate of convenience and necessity issued by the commerce commission, authorizing the Consol Power Company to render such service; that although said certificate so granted by the commerce commission to said Consol Power Company was held to be illegal and void by the Supreme Court in the case of *Illinois Power & Light Corp. v. Commerce Commission,* 320 Ill. 427, yet said Consol Power Company wrongfully and in utter disregard of said decision continues to serve the persons it was prohibited from serving by said order and judgment of the Supreme Court;

That said Consol Power Company without any certificate of convenience and necessity authorizing it to serve the village of White City with electric current for light and power purposes and without applying for any such certificate, and without an order of the commerce commission giving it such authority, unlawfully entered into a contract to furnish said village of White City with light, heat and power for a term of, to wit, five years; that said Consol Power Company, since said merger, has entered into a contract with the city of Staunton, whereby the former has agreed to sell at wholesale, and said city has agreed to purchase, all the electric light and power current required for said city and its inhabitants for a period of five years, at a fixed price, which said contract was entered into without a certificate of convenience and necessity authorizing said Consol Power Company to furnish such service and without any

approval of said contract by the commerce commission;

That certain lighting contracts, which had been entered into between the village of Livingston and one of the subsidiaries of the Illinois Traction System, which had been assigned to the Illinois Power and Light Corporation, have since the merger aforesaid, expired, and that the coal company and the Consol Power Company tried to intimidate the citizens of said village and prevent the same from renewing its lighting contracts with said Illinois Power and Light Corporation and has and still does otherwise intermeddle into the affairs existing between the said Illinois Power and Light Corporation and said village, although the former is possessed of a certificate of convenience and necessity to enter into and renew their contracts with said village and although said Consol Power Company has no certificate of convenience and necessity to operate in said village;

That said Consol Power Company, without a certificate of convenience and necessity, has solicited the business of divers industries and persons located in said cities and villages and between the same;

That complainant, by reason of the location of its said electric light plants, transmission lines and distribution systems, and by reason of the fact that the same were all constructed and the money necessarily expended in constructing the same has been expended and invested by the said Illinois Power and Light Corporation and its predecessors, has gained the prior right to a certificate of convenience and necessity to serve the said villages of White City and Mount Olive, the city of Staunton, the territory between said villages and cities, and in and around the said villages and cities, with electric light and power service and was then and always has remained capable of providing adequate service and by reason of the premises

the situation has not arisen whereby the public's convenience and necessity require the establishing of the Consol Power Company as another public utility within said territory;

That said transmission line extending from said mine No. 15 of the coal company to its said mine No. 7, and thence to its said mine No. 14, is substantially all of the property devoted to a public service or utility by the said Consol Power Company, and that said transmission line above described is owned by the coal company and not by the Consol Power Company; that although the Consol Power Company claims to be purchasing current from the coal company and transmitting the same over the transmission line aforesaid and retailing the same to the said villages of White City and Mount Olive, and the said city of Staunton and divers industries and persons residing in said territory, that said contention in truth and in fact is not true for the reason that current is transmitted by said coal company to its said mines and without any meter in series disclosing the amount of current transmitted to or consumed by the coal company or the Consol Power Company, and the only meters connected with said transmission line are placed in series with lines tapped for said transmission lines and being the meters determining the amount of current which the village of White City receives and another disclosing the amount of current which the village of Mount Olive receives, and another disclosing the amount of current which the city of Staunton receives and divers other meters located on another tap line, which discloses the amount of current received by divers individuals and users of the current, without any meter disclosing the amount of current which the Consol Power Company claims to receive from the coal company and that, by reason thereof, no current is ever acquired or purchased by the Consol Power Company but is generated by, and remains the current of, the coal com-

pany and no current is, in fact, ever sold by the coal company, nor bought by the Consol Power Company, and that the conduct of said defendants is only a sham and device for disposing surplus power generated by the coal company;

That by reason of the premises, said contracts entered into by the Consol Power Company and said cities, villages, business enterprises and persons, as aforesaid, are void and contrary to the provisions of the Public Utilities Act, Cahill's St. ch. 111a, and to the public policy of the State of Illinois, and in contempt of the Supreme Court and are an irreparable injury to the Illinois Power and Light Corporation;

That the Illinois Traction System, through one of its subsidiary corporations, prior to the time of the passage of the first Public Utilities Act in 1913, had constructed a transmission line to the village of Williamson, which had prior to said time constructed a distribution system for said village, and said Illinois Traction System had manufactured and transferred through its said subsidiary corporation, electric current and sold the same at wholesale to said village, which had used a portion thereof in lighting its streets and alleys and the balance thereof had been sold by said village to the residents and conveyed through its said distribution system; that as said service was rendered prior to the passage of the first Public Utilities Act, no certificate of convenience and necessity was required; that at the time of said merger said contract, and the right to render such service thereunder to said village, was assigned to your orator and further authorized by a general order of the commerce commission;

That prior to the time of the passage of the first Public Utilities Act, the village of Livingston had constructed a certain distribution system, used for lighting its streets and alleys, and for furnishing light, heat and power to the individuals residing in said

village, and prior to the time of the passage of said act a transmission line had been constructed by the Illinois Traction System to said village and the same was thereafter, and prior to the time of the merger, purchased and acquired by the Illinois Traction System, and the subsidiary corporations thereof; that in 1895 it obtained a certificate of convenience and necessity to extend its transmission line from the Mount Olive-Staunton Coal Company, through the village of Williamson and to a point south of said village and to drill a hole where said transmission line passed into the ground and into certain entries of the New Staunton Coal Company; that since complainant obtained said certificate of convenience and necessity it has purchased said distribution system of the village of Livingston and paid therefor $16,000, and since said time has expended the sum of $20,000 in repairing and extending said system;

That at the present time and at no time prior thereto has the coal company or the Consol Power Company, or any assignor of them, rendered any electrical service to the villages of Livingston and Williamson;

That since the time of the purchase of the distribution system of the village of Livingston, the coal company and the Consol Power Company, through its officers, agents and employees, have intermeddled with the citizens of said villages of Williamson and Livingston, have stirred up strife against your orator and have encouraged the residents of said villages and town boards thereof to abrogate their respective contracts with your orator and have attempted to obtain contracts authorizing the Consol Power Company and the coal company to furnish electric current to said villages and have caused certain citizens in said village of Livingston to file a bill in equity praying for a cancellation of its contract of sale of its distribution system to your orator;

That said defendants, in further carrying out a plan of injuring your orator and of obtaining the right

to render the electric service to said villages have obtained from the commerce commission a certificate of convenience and necessity to serve said villages with electric light, power and heat, but said commerce commission has expressly stated that it has decided no right adversely to the right of the Illinois Power and Light Corporation and that the right to render said service to said villages, as between your orator and the said defendants is not determined; that a petition for a review of said order was filed by your orator with the commerce commission, which has been granted by said commission, and said cause now stands for further hearing;

That at the time the Consol Power Company was organized and incorporated, and ever since said time, your orator had large plants, capable of manufacturing more than enough electrical current to supply all of the territories mentioned in the bill, and was possessed of all the machinery, appliances and equipment for rendering such service, and had unlimited financial ability to install any additional equipment necessary, and was rendering a vast amount of service within the immediate territory mentioned in the bill, before the Consol Power Company was even incorporated, and that before said date your orator was possessed of certificates of convenience and necessity authorizing it to legally serve all its then customers, and that under the construction of the Public Utilities Act, Cahill's St. ch. 111a, was possessed of the right of, and authority to render any and all kinds of electrical service to all of said cities, villages and towns mentioned and was ready, willing, and able to furnish such service and also furnish service to all the industries, firms and individuals living between and around said cities, villages and towns, and that by reason thereof it had a prior right to render service to all the places aforesaid and to the residents and inhabitants thereof but said coal company and the Consol Power Company

have intruded into said territories and extended the said transmission line owned by the coal company, and that by reason of said transmission line the defendants are serving the said cities and villages and towns, excepting the villages of Williamson and Livingston, and other industries located therein, and a great many citizens residing in and between and around said villages and towns, as aforesaid, all of which conduct is illegal and without warrant at law;

That said defendants have, within a few days, purchased and placed along a certain line leading from the city of Staunton to the village of Williamson, a large number of electric light poles, with cross-arms thereon, and are engaged in digging holes for the setting of said poles, and in hauling out other equipment necessary in the building of a transmission line between the cities of Staunton and the village of Williamson and have further declared their intention of extending said line from the village of Williamson to the village of Livingston, for the purpose of rendering service to said village;

That said defendants have obtained some kind of a contract with said villages and unless the defendants are enjoined from rendering such service to said villages, they will, within a few weeks, complete said line and begin rendering service to the said villages and thereby deprive your orator of the right to render such service and cause to your orator irreparable injury and damage unless said defendants are restrained.

In the amendment to the bill it is averred that a few months prior to the filing thereof the coal company applied for and obtained increased charter powers authorizing it to engage in the business of manufacturing and generating electrical power and current and to sell the same, by special contracts only, to such customers in such quantities, at such times and places and on such terms as said appellee might elect; that since the time of said increased charter power both defend-

ants had been doing a public utility business and had entered into contracts with the cities of Staunton and Mount Olive and the village of White City, in violation of law; that they have discriminated in the rates charged for service to said cities and villages, and are rendering service to Staunton at two and one-quarter cents per kilowatt, Mount Olive at three cents per kilowatt and to White City at three and one-half cents per kilowatt, for the same class and rate of service.

As the question involved on this appeal is the sufficiency of the bill as tested by the demurrer, it seemed necessary to set out the essential averments thereof at some length. It is apparent that the concrete substance thereof presents the facts to be that by the organization of appellant, and the consolidation and merger therein of the various corporations and subsidiary companies thereof, it became a fully established and equipped public utility corporation, capable of furnishing the entire territory mentioned in the bill with all necessary electric power and service and is furnishing a large portion of said territory with such service; that at the time of its organization the coal company was a mining corporation, chartered only for the purpose of mining and selling coal; that the latter, subsequent to the organization of appellant, constructed a plant for the purpose of manufacturing electricity of sufficient capacity with which to operate its mines then in existence, and to operate other mines which it then contemplated to open in the future; that after the World War it abandoned its intention to open further mines and found itself with an electric plant capable of producing much more electrical energy than was necessary for the operation of its existing mines. It being organized for the purpose of mining and selling coal only, and having no charter powers to manufacture and sell electricity, it caused the Consol Power Company to be incorporated for the purpose of disposing of its surplus electrical power. The

status of the Consol Power Company has been defined by the Supreme Court in the case of *Illinois Power & Light Corp. v. Illinois Commerce Commission, supra,* to which we will refer hereafter. From the allegations in the bill it further appears that the coal company and the Consol Power Company have made contracts with divers persons, industries, villages and cities within the territory mentioned for the purpose of supplying the same with electrical current and are now rendering such service and attempting to extend such service to other individuals, industries and cities, all within the territory and field in which appellant theretofore had been established and is capable of rendering such service.

The grounds for demurrer may be grouped as follows: (1) That appellant has not stated a case entitling it to any relief in a court of equity against said defendants or either of them; (2) that the cities of Staunton and Mount Olive, and the villages of White City, Livingston and Williamson are each necessary parties to the bill since it appears therefrom that appellees had entered into contracts with such municipalities, which it is sought to have declared illegal and void.

Counsel for appellees in their brief and argument have very tersely presented their views upon the above issues as follows: "Appellees admit, so far as this appeal is concerned, that they cannot lawfully do a public utility business in Staunton, Mount Olive, White City, etc. Appellees, however, insist that they are not doing a public utility business, and that the facts averred in the Bill of Complaint and admitted in appellant's Statement, Brief and Argument, are conclusive on such points.

"The issue then, on this appeal, is, *whether or not the business being done by appellees, is a public utility business.*

"There is a secondary issue, in this: If in fact the field which appellant says is being invaded, is not ap-

pellant's field or territory, then appellant has no interest in the subject matter of the litigation, and is not entitled to prosecute this suit.

"The third issue involved is, whether or not the municipalities of Staunton, Mount Olive, White City, Livingston and Williamson, are necessary parties."

It is apparent that the admission that appellees cannot lawfully do a public utility business in Staunton, Mount Olive, White City, Livingston and Williamson, eliminates the secondary issue above presented because the municipalities mentioned, and the territory surrounding them, comprise all the territory or area involved in this litigation. Two questions then remain for consideration: (1) Are the appellees, under the allegations of the bill, doing, or attempting to do, a public utility business in said territory? (2) Were the said municipalities necessary parties to the bill?

The argument by counsel for appellees, in support of the first contention, is based upon two propositions: First, that said municipalities are not included in the Commerce Commission Act, Cahill's St. ch. 111a, ¶ 16 et seq., but are excluded therefrom, are free from any control or supervision of the commerce commission and have the unrestricted power to contract for electricity with any person or corporations with which they may desire; therefore, since the municipalities are not under the jurisdiction of the commerce commission, appellees, by selling power thereto, are not acting as a public utility. Second, that said appellees do not hold themselves out as public utility corporations to furnish electricity to the public generally, but select their own customers under special contracts with each and consequently are not doing, and do not intend to do, a public utility business.

It is first important to consider the purpose of the passage of the Public Utilities Act, later re-enacted in the Commerce Commission Act, Cahill's St. ch. 111a, ¶ 16 et seq. In the case of *Illinois Power & Light Corp.*

*v. Commerce Commission,* 320 Ill. 427, in which the Consol Power Company, appellee in this case, was also appellee in that case, it was held: ''The policy established by legislation for the regulation of public utilities is to provide the public with efficient service at a reasonable rate by compelling an established public utility occupying given field to provide adequate service and at the same time to protect it from ruinous competition. *(Choate v. Commerce Com.* 309 Ill. 248; *West Suburban Transportation Co. v. Chicago & West Towns Railway Co. id.* 87). By the adoption of this act it became the public policy of the State that free competition among public utilities did not promote the public service.''

In the case of *West Suburban Transp. Co. v. Chicago & West Towns Ry. Co., supra,* it was held: ''The policy of the Public Utilities act is that existing utilities shall receive a fair measure of protection against ruinous competition. . . . Where one company can serve the public conveniently and efficiently it has been found from experience that to authorize a competing company to serve the same territory ultimately results in requiring the public to pay more for transportation, in order that both companies may receive a fair return on the money invested and the cost of operation.''

In *Choate v. Commerce Commission, supra,* it was held: ''The theory of the Public Utilities act is to provide the public with efficient service at a reasonable rate by compelling an established carrier occupying a given field to provide adequate service and at the same time to protect the existing utility from ruinous competition.''

In the original Public Utilities Act of 1913 (Session Laws 1913, page 465) the term ''Public Utility'' is defined in section 10 thereof as follows:

''The term 'public utility,' when used in this Act, means and includes every corporation, company, association, joint stock company or association, firm, part-

nership or individual, their lessees, trustees, or receivers appointed by any court whatsoever (except, however, such public utilities as are or may hereafter be owned or operated by any municipality) that now or hereafter:

"(a) May own, control, operate or manage, within the State, directly or indirectly for public use, any plant, equipment or property used or to be used for or in connection with the transportation of persons or property or the transmission of telegraph or telephone messages between points within this State; or for the production, storage, transmission, sale, delivery or furnishing of heat, cold, light, power, electricity or water; or for the conveyance of oil or gas by pipe line; or for the storage or warehousing of goods; or for the conduct of the business of a wharfinger; or that

"(b) May own or control any franchise, license, permit or right to engage in any such business."

Section 10 of the Commerce Commission Act of 1921 (Cahill's St. ch. 111a, ¶ 25; Smith-Hurd Rev. St. 1925, p. 1996) defines the term in substantially the same language.

In section 2 of the act commonly known as the Municipal Ownership Act, passed in 1913 as a companion measure with the original Public Utilities Act (Cahill's St. ch. 111a, ¶ 2; Smith-Hurd Rev. St. 1925, p. 2021) the definition is as follows:

"The term 'public utility,' when used in this Act, means and includes any plant, equipment or property, . . . used . . . for or in connection with the transportation of persons or property or the conveyance of telegraph or telephone messages; or for the production, storage, transmission, sale, delivery, or furnishing of cold, heat, light, power, water, or for the conveyance of oil or gas by pipe line; or for the storage or warehousing of goods; or for the conduct of the business of wharfinger."

The Municipal Ownership Act provides that any city shall have the power, subject to the provisions of the Act, to acquire, construct, own and operate any public utility, the product or service of which, or a major portion thereof, is or is to be supplied to the city or its inhabitants, and to contract for, purchase and sell to private businesses or corporations, the product or service of such utilities; and to make all needful rules and regulations in relation thereto. (Cahill's St. ch. 111a, ¶ 1; section 1, Smith-Hurd Rev. St. p. 2021.) The court in the case of *Springfield Gas & Electric Co. v. City of Springfield,* 292 Ill. 236, in discussing the intention of the legislature in passing the Public Utilities and Municipal Ownership Acts, said: "The statute, we must infer, was adopted in accordance with a plan. (*State v. Gantz,* 124 La. 535.) That plan was, that all private corporations owning and operating public utilities should be bound by all the provisions of the act and that all municipal corporations should be excluded from the provisions of the act. Public utilities owned and operated by munici-- palities were to be governed and controlled by the provisions of the Municipal Ownership act and regulated only by such municipalities."

A city has the right to manufacture electricity and sell the same to its inhabitants or it may purchase the same elsewhere and resell it. A city, in acting as a public utility, does so in its proprietary capacity. There is nothing in either the Commerce Commission or the Public Utilities Act, which prohibits a city from purchasing electricity from a public utility. Section 81, article 6, of the Commerce Commission Act, Cahill's St. ch. 111a, ¶ 100, provides that subject to the provisions of that article a city shall have power with respect to public utilities furnishing services within the limits of such city, except railroads, to regulate the quality, adequacy and safety of said service, and to

determine and prescribe just and reasonable rates or other charges for any service, product or commodity rendered within such city by any public utility, etc. This section further provides that nothing in said article shall be considered to conflict with powers conferred by the act upon the commerce commission, so far as the exercise of such powers by the commission is necessary or appropriate to its authority with respect to public utilities, under the jurisdiction of the commission. The mere fact that a corporation doing a public utility business sells a part of its product to a municipality does not thereby *ipso facto* deprive it of its character as a public utility and remove it from the supervision of the commerce commission. It is also alleged in the bill of complaint that appellees are selling electricity to and are soliciting such business from numerous persons, industries and municipalities within the field of appellant. Appellees may still be public utilities although some of its customers may be municipalities. The question involved on this appeal is whether, under the facts alleged in the bill, the appellees are acting as public utilities in the territory mentioned without a lawful right to do so. The allegations in the bill, that among the customers of appellees, to whom they are furnishing electricity, are several municipalities, do not have the effect of stating facts which conclusively show that appellees are not public utilities as contended by counsel for appellees. If it should be conceded that the commerce commission would have no supervision or regulation of the rates to be charged by appellees to such municipalities or of the adequacy or efficiency of the service rendered, yet if all the facts alleged in the bill show that appellees are, in fact, assuming to be public utilities, and exercising the functions thereof, they will be considered public utilities and subject to the provisions of the Commerce Act, except in regard to the matters mentioned. Whether an instrumentality which sells elec-

tricity is a public utility or not is purely one of fact. *Highland Dairy Farms Co. v. Helvetia Milk Condensing Co.*, 308 Ill. 294. The case of the *Illinois Power & Light Corp. v. Commerce Commission, supra,* in which the Consol Power Company was appellee, was an appeal from a judgment of the circuit court confirming an order of the commerce commission granting to said appellee a certificate of convenience and necessity, and the same facts, in so far as the Consol Power Company is concerned, appeared in that case as are alleged in the bill in the case at bar. In that case it appeared that the coal company, one of the appellees here, for the purpose of selling its surplus electric power, had erected a transmission line to the village of White City, which owned its own distribution system, but bought the electricity from the coal company. The latter also sold power to 23 consumers who lived just outside the corporate limits of the city of Staunton and also to five or six employees living in company houses along the transmission line. A *quo warranto* proceeding was brought against the coal company challenging its right to engage in the business of rendering electric service to private consumers. To avoid the effect of this suit, the Consol Power Company was organized by the coal company, to which was granted a certificate of convenience and necessity to engage in the business of rendering electric service along the route of the present electric line of the coal company, except in so far as the right to render service in such territory was granted to the Illinois Power and Light Corporation under a certificate issued June 25, 1923. The court there held: "Before appellee was organized appellant was in the field operating a public utility fully equipped to adequately serve all the consumers in the territory. Appellee was organized for the purpose of providing a means to dispose of a temporary excess of electric energy which the Consolidated Coal Company had the

equipment to produce. The total amount of the authorized capital stock of (defendant) appellee is $5,000, and all of this stock is owned by the coal company and its officers. Appellee owns no power station, transmission lines or electrical equipment of the character used and useful in the operation of a public utility; nor does it have a contract with any person or corporation to furnish the necessary current to render the service required. It is clear from the evidence in the record that appellee was organized for the purpose of securing a certificate of convenience and necessity to continue the public utility business theretofore conducted by the Consolidated Coal Company, and that the facilities of the Consolidated Coal Company are to be the only facilities of appellee. It is equally clear that appellant is able and willing to serve the twenty-five or thirty consumers who live outside the corporate limits of Staunton who have been served from the transmission line of the coal company. All of the persons within the territory which appellee proposes to serve are within one mile of an existing line of appellant. The Public Utilities act provides the means for compelling appellant to provide adequate service for the public in the territory which it serves. If the company now occupying the territory is incapable of providing adequate service, then, and not until then, will a situation arise when the public convenience and necessity may require the establishment of another utility.'' The judgment of the circuit court was reversed and the order of the commission set aside. It will be noted that in the above case the village of White City owned its own distribution system but bought its power from the coal company. The effect of this decision was to hold that both the Consolidated Coal Company of St. Louis and the Consol Power Company were public utilities and had no right to sell electricity in the field already occupied by appellant. The only

difference between that case and the one under consideration, so far as the Consol Power Company is concerned, is that appellees, in addition to rendering service to the village of White City, are attempting to extend their lines and render service to additional municipalities. All the municipalities mentioned in the bill are within one mile of the transmission lines of appellant. In regard to the appellee, Consolidated Coal Company of St. Louis, additional facts are alleged in the amendment to the bill, wherein it is set out that a few months prior to the filing of the bill the coal company obtained from the secretary of state increased power in its charter by which it was authorized to engage in the business of manufacturing, generating and selling electric power and current by special contracts only, to such customers, in such quantities and at such times and places and on such terms as it might elect, and that since the coal company had obtained such increased charter power both appellees have been doing a public utility business and have entered into contracts with the cities of Staunton and Mount Olive, and the village of White City, in violation of law. Counsel for appellees insist that by this amendment the bill shows that the coal company is not a public utility for the reason that it does not hold itself out to sell electricity to the public generally, but only sells the same to selected customers and therefore does not come within the definition of a public utility. While the charter powers of a corporation may be inquired into to determine whether it is authorized to act as a public utility, yet the fact that it may not have such power to so act is not conclusive that it is not, in fact, acting as a public utility. Such a corporation may unlawfully assume to be a public utility and render public utility service in violation of its charter powers. As stated before, whether a person, partnership or a corporation is a public utility is one of fact. If the acts of the coal company, as alleged in the bill,

constituted a public utility, then the sufficiency of the bill is established. The alleged increased charter powers of the coal company assume to grant to it the right to manufacture and sell electric power, not only within the territory mentioned in the bill, but throughout the State of Illinois. Under this charter, if upheld, it could extend its lines anywhere within the State, sell its electric power to anybody who might wish to purchase it, under any rates it might see fit to charge and claim that all such sales were of a private character and consequently it was not a public utility nor under the supervision or regulation of the commerce commission. It could invade any field already occupied by a legitimate public utility. Such a condition would create a far more ruinous competition than existed before the passage of the Public Utilities Act for the reason that a legitimate public utility, established in a certain field, would be, at all times, bound by the orders, rules and regulations of the commerce commission in regard to its rates, the extension of its lines, the adequacy of its service and in many other restrictive respects, while the other would be free and unrestricted by any such rules and regulations. No lawful public utility could exist with such a competition. The purpose and object of the Public Utility Act is to prevent such ruinous competition. Under the rule contended for by appellees any now existing public utility corporation could have its charter amended in like manner and thus nullify entirely the Commerce Commission Act, Cahill's St. ch. 111a, ¶ 16 *et seq.* The case of *Highland Dairy Farms Co. v. Helvetia Milk Condensing Co., supra,* was decided purely upon the question of fact whether the evidence showed that the appellees therein assumed and exercised the powers of a public utility. The majority of the court held that under the evidence introduced they had not assumed and exercised such power. One of

the justices dissented from this finding of fact, and upon *the theory* that the proofs showed that the appellees *had* assumed and exercised the powers of a public utility, in his dissenting opinion said: "The appellees have assumed and exercised the powers of a public utility and enjoyed the resulting benefit but have discriminated between applicants for service and selected favored persons and corporations. *It is not their privilege to say that they are absolved from the duties and obligations of a public utility because they have not been lawfully authorized to engage in the business to which such duties and obligations attach.*" As stated before it has already been held in the case of *Illinois Power & Light Corp. v. Commerce Commission, supra,* that before the coal company had procured an enlargement of its charter powers, as aforesaid, both it and the Consol Power Company were assuming to act as public utilities. In our opinion such enlargement of the charter powers of the coal company, while still acting in the same manner as shown in the last-mentioned case, does not change its character from that of a public utility. If a person or corporation assumes to act as a public utility and exercises the powers thereof, although unlawfully, it will be considered a public utility. If such were not the true rule then the present public policy of this State would be of no force or effect. In our opinion the facts as alleged in the bill are sufficient to charge appellees with being public utilities.

It is further contended that the bill is fatally defective because the municipalities mentioned have not been made parties thereto for the reason that the bill seeks to have their contracts with appellees declared null and void and that appellees should have the right to appear and defend the same. While it is alleged in the bill as the pleader's conclusion of law that said contracts are void, the prayer for relief does not seek

to have said contracts so declared or set aside or any relief in regard to them. The only relief sought by the bill is to restrain the appellees from acting as public utilities within the field now occupied by appellant. The other allegations in regard to the making of the contracts by appellees and the municipalities are simply allegations of facts tending to show that appellees are assuming to act as public utilities. The rights of appellant are not dependent upon the validity or invalidity of these contracts and cannot be abated or destroyed by contracts entered into between appellees and third parties. The municipalities were not necessary parties, otherwise every person, industry or other customer to whom appellees claim they are furnishing electricity by a private contract would likewise have to be made a party to the bill.

In our opinion the circuit court erred in sustaining the demurrer to the amended bill. The decree is therefore reversed and cause remanded with directions to vacate the order dismissing the amended bill for want of equity and to overrule the demurrer thereto.

*Reversed and remanded with directions.*