## ILLINOIS POWER & LIGHT CORPORATION v. CITY OF CENTRALIA, ILL., et al.

### No. 768–D.

District Court, E. D. Illinois.
Aug. 1, 1935.

Henry T. Hunt, Sp. Asst. Atty. Gen., for Mr. Ickes.

John L. Dryer and M. J. Brown, both of Hillsboro, Ill., and June C. Smith and Chas. Wham, both of Centralia, Ill., for plaintiff.

L. H. Jonas, City Atty., of Centralia, Ill., and Poppenhusen, Johnston, Thompson & Raymond, of Chicago, Ill., for city of Centralia.

LINDLEY, District Judge.

Plaintiff sues to enjoin the city of Centralia, a municipal corporation, and its officials and the Federal Administrator of Public Works from erecting a proposed municipally owned electric public utility; from issuing and selling certificates in order to raise funds to pay therefor; from performing a contract between the Administrator and the city whereby the former agrees to grant to the city a part of the cost of the said structure and to loan to the city, by purchase of said certificates, the balance, and from carrying out any proposed action in connection with said construction. The case is submitted upon bill and answer.

Plaintiff. is a public utility corporation, organized under the laws of the state of Illinois, owning and operating generating stations, transmission lines and distribution systems in the city and other communities, all interconnected. The system operates in an extensive territory, wholly within Illinois, under the direction and control of the State Commerce Commission. The city has issued and plaintiff owns a franchise to conduct its business, and plaintiff's investment in the city, exclusive of generating and transmission facilities, has a value of more than $150,000. It is a taxpayer of the United States, the state, the counties wherein its property is located and the city, and the owner of valuable properties subject to taxation by the official bodies aforesaid.

On December .1, 1933, the city council adopted a resolution directing the mayor to apply to the Federal Emergency Administration of Public Works for a loan of $428,-000 and a gift or grant of $147,000 for the purpose of financing the construction of a

municipally owned public utility. Plaintiff protested before the State Advisory Board. It offered to present facts showing why, as it says, the application should not be approved, but no hearing was had, and plaintiff thereupon filed with the Administration a written protest. That body thereafter duly approved the application.

On November 30, 1934, the city passed an ordinance authorizing the sale of public utility certificates in the amount of $477,-000, to defray the cost of such utility, authorizing operation of the same and enumerating certain conditions and provisions with regard thereto. An election was held, at which the voters approved the ordinance for construction and operation of the utility and the issuance and sale of certificates. The city and the Administration then entered into a contract, under which the city agrees to construct the utility and the Administrator to advance to the city the sum of $477,000 for the purpose of financing the construction to be financed by certificates for said amount. Thirty per cent. of these the Administrator proposes to cancel, thereby working a grant or gift to the city of so much of the cost.

Plaintiff contends that what has transpired and what is about to occur is illegal and violates the constitutional rights of the plaintiff under the Constitution of the state of Illinois and that of the United States; that the proposed loan and gift are not authorized by the national act; that the result will be, not to relieve unemployment, but rather to contribute to increase thereof; that interstate commerce is not involved; that the acts performed and proposed to be performed are in violation of the Fifth, Tenth, and Fourteenth Amendments to the Constitution of the United States, and deprive plaintiff of its property without due process of law; that the Constitution does not authorize the federal government to make a loan, gift, or grant of public funds to the city for the purpose of constructing the utility, the effect of which will be to duplicate and to destroy the value of existing adequate facilities; that to approve such action will bring about an unlawful delegation of legislative power by the Congress to the President and to the Administrator; that the project is entirely local in character and not related to the general welfare of the United States; that the ordinance is void under the Constitution of Illinois; that the ordinance does not sufficiently describe the proposed work as required by state statute; that the effect of the contract and ordinance is to increase the indebtedness of the city beyond its constitutional and statutory limits; that by its action the city attempts to contract away its governmental functions in violation of the Constitution, public policy, and statutes of Illinois; and that the Municipal Ownership Act is unconstitutional for the reason that its title is not sufficiently broad to cover the legislation, as required by the Constitution of Illinois.

It is the contention of plaintiff that its properties, franchise, and business will suffer irreparable injury as result of the aforesaid alleged illegal action of defendants, and that it will thereby be subjected to ruinous competition or compelled to abandon and thereby lose its property.

Defendants contend that plaintiff is not qualified to question in this action the constitutionality of the acts of Congress involved or of the statutes of the state; that title 2 of the National Industrial Recovery Act (section 201 et seq. [40 USCA § 401 et seq.]) is constitutional and involves no wrongful delegation of legislative power; that the project is not in violation of the Fifth, Tenth, or Fourteenth Amendments; that the purpose of the Administrator was to increase employment; and that the project is justified under the general welfare clause of the United States Constitution; and denies specifically illegality in anything heretofore done or proposed to be done.

In support of the proposition that plaintiff has no right to maintain this suit, defendants cite many cases, in all of which the courts relied upon the generally well-recognized principle that one who attacks the constitutionality of a statute or the legality of acts must show that he is within the class of persons with respect to whom the law is unconstitutional or the acts illegal, and that the defects complained of injure him. The soundness of this doctrine is not to be disputed.

However, in the present instance, it is obvious that plaintiff is within the qualified class of persons. It is a taxpayer and a franchise holder, and the alleged unconstitutional and illegal acts bring upon it irreparable damages as such. The Circuit Court of Appeals for the Eighth Circuit in the case of City of Campbell, Mo., et al. v. Arkansas-Missouri Power Co. (C. C. A.) 55 F.(2d) 560, 562, dealt with precisely this question. The language there used is per-

tinent here: "It is urged that, inasmuch as the plaintiff's franchise was not an exclusive one, it had no right to maintain this suit for injunctional relief. The plaintiff, however, had a franchise under which it was entitled to maintain and operate its lighting system in the city of Campbell, and it also had a contract with the city for street lighting. The fact alone that the plaintiff had this franchise would, of course, not prevent the city from erecting and maintaining a municipal light plant, if, in doing so, it did not exceed its power and authority. As the owner of this franchise, however, the plaintiff was entitled to relief against the illegal acts of others who might assume to exercise the privilege conferred upon it by its franchise. A franchise is property, and, as such, is under the protection of the law, and without express words it is exclusive as against all persons acting without legal sanction. True, plaintiff's franchise was not exclusive in the sense that the city might not grant similar right to another, yet it was exclusive against any one who assumed to exercise the privilege granted the plaintiff, in the absence of authority or in defiance of law. * * * We are clear that the plaintiff, as the holder of this franchise to maintain and operate the plant in defendant city, was entitled to protection against all illegal competition."

This case was later followed by Oklahoma Utilities Co. v. City of Hominy (D. C.) 2 F. Supp. 849, and to the same effect is Duke Power Co. v. Greenwood County (D. C.) 10 F. Supp. 854 at page 862. Cases relied upon by the Court of Appeals in Campbell v. Arkansas-Missouri Power Co., supra, are there collected. See, also, Bartlesville Elec. L. & P. Co. v. Bartlesville R. Co., 26 Okl. 453, 109 P., 228, 29 L. R. A. (N. S.) 77; 2 Pomeroy's Equitable Remedies, § 583 et seq.; 5 Pomeroy's Eq. Jurisprudence (2d Ed.) §§ 583 and 584; Frost v. Corporation Commission, 278 U. S. 515, 49 S. Ct. 235, 73 L. Ed. 483.

In Springfield Gas & Electric Co. v. Springfield, 292 Ill. 236, 126 N. E. 739, 741, 18 A. L. R. 929, the privately owned utility sued to enjoin the Springfield Gas & Electric Company, owner of a municipal plant, from engaging in what was alleged to be illegal competition. The court sustained the jurisdiction, saying: "We are disposed to agree with the proposition of appellant that a private corporation lawfully operating a public utility may have an injunction against another private corporation operating without authority of law a similar utility which competes with and injures the former's business." Since a city conducts a municipal public utility in the capacity of a business proprietor, the language and reasoning of this case are directly applicable to the case at bar.

In Callaghan & Co. v. Smith, 304 Ill. 532, 136 N. E. 748, 750, one publishing company sued to enjoin another from publishing a compilation of the state laws under what was said to be an unconstitutional statute. There the court said: " * * * If the act in question is, in accordance with the theory of the bill, an unconstitutional grant of special privilege to Smith in the conduct of that business which will cause injury to the business of the appellant, the latter's only remedy is an injunction against the use of the privilege. If the exercise of the unlawful privilege will injure the appellant's business, the nature of the injury is such that no argument is necessary to show the inadequacy of any action at law for damages. The remedy by injunction against the enforcement of an unlawful ordinance or an unconstitutional law has often been recognized where a special injury to the complainant has been shown and there is no adequate remedy at law." See, also, Cicero Lumber Co. v. Town of Cicero, 176 Ill. 9, 51 N. E. 758, 42 L. R. A. 696, 68 Am. St. Rep. 155; Illinois Power & Light Corp. v. Consolidated Coal Co., 251 Ill. App. 49.

I agree that one who has a franchise has a right to complain of the acts of others, who in violation of the Constitution and the law, would enter into competition with him. Plaintiff has no right to complain because the city of Centralia determines to construct a municipally owned public utility. The statutes authorize such action, if the proceedings be in accord with the Municipal Ownership Act, and the mere fact that such legal competition by a municipally owned plant may destroy plaintiff's business furnishes no ground for complaint. Joplin v. Southwest Mo. Light Co., 191 U. S. 150, 24 S. Ct. 43, 48 L. Ed. 127; Skaneateles Waterworks Co. v. Skaneateles, 184 U. S. 354, 22 S. Ct. 400, 46 L. Ed. 585; Madera Water Works v. Madera, 228 U. S. 454, 33 S. Ct. 571, 57 L. Ed. 915. But the situation here goes far beyond that just mentioned, for it is complained that the competition which will develop is not to arise from an authorized municipal act, but

is to owe its existence to and grow entirely out of illegal and unconstitutional acts. Plaintiff is not bound to suffer unheard from illegal municipal action; it is of such action that it now complains.

What is said is sufficient to distinguish the cases relied upon by defendants. Thus, in New Orleans, M. & T. R. Co. v. Ellerman, 105 U. S. 166, 26 L. Ed. 1015, the Supreme Court said that if the competition which is complained of is not "illegal," the plaintiff has no right to complain. In Skaneateles Waterworks Co. v. Skaneateles, 184 U. S. 354, 22 S. Ct. 400, 46 L. Ed. 585, the court merely held that lawful competition by a city did not endow the existing utility with any right to complain, and that if the municipality concluded to exercise its statutory right to enter into the municipal ownership field to the detriment of the privately owned utility, the latter's property was not taken without due process of law. True, but if the proposed exercise of authority by the city is not within the statute under which it purports to be had or is unconstitutional, the injured party has a right to be heard in a court of equity for the purpose of affording him an adequate remedy.

 Plaintiff contends that in Illinois a municipality may not finance the construction of a utility by issuing certificates unsecured by mortgage upon the plant. In considering this question it is necessary to remember that municipal corporations have no inherent power as such, but are created by the Legislature, and derive their existence and all powers from the grants made by that body. City of Chicago v. Murphy, 313 Ill. 98, 144 N. E. 802; Barnard & Miller v. City of Chicago, 316 Ill. 519, 147 N. E. 384, 38 A. L. R. 1533; Crerar Clinch Coal Co. v. Chicago, 341 Ill. 471, 173 N. E. 484; City of Chicago v. Moore, 351 Ill. 510, 184 N. E. 621.

It follows that municipal corporations possess and can exercise only such powers as are either mentioned in express terms or are necessarily and fairly implied in the powers expressly created or essential to the declared objects and purpose of the corporation. In the case of City of Carlyle v. Nicolay, 333 Ill. 562, 165 N. E. 211, 214, a special assessment proceedings was declared null and void for the reason that the ordinance of the city council upon which the proceedings was based, did not contain a proper enacting clause. The municipality had a perfect right to bring about the particular public improvement, provided it do so in a legal manner. Though the objection made was of no particular consequence, in so far as the objector was concerned, he was permitted to take advantage thereof. The court said: "It is a general rule that when the Legislature grants to a municipal corporation power to do any act and prescribes the manner in which the power shall be exercised, the power must be exercised in the manner stated in the grant and not otherwise." "The powers of a municipal corporation are not enlarged by liberal construction but are strictly construed, and any ambiguity arising out of a grant of power or a reasonable doubt concerning its existence is resolved against the municipality which claims to exercise the power." Washburn v. Forest Preserve District, 327 Ill. 479, 487, 158 N. E. 801, 804; Barnard & Miller v. City of Chicago, 316 Ill. 519, 522, 147 N. E. 384, 38 A. L. R. 1533; City of Rockford v. Nolan, 316 Ill. 60, 64, 146 N. E. 564; Aberdeen-Franklin Coal Co. v. City of Chicago, 315 Ill. 99, 100, 145 N. E. 613; Arms v. City of Chicago, 314 Ill. 316, 319, 321, 145 N. E. 407; City of Chicago v. Blair, 149 Ill. 310, 36 N. E. 829, 24 L. R. A. 412; West Chicago Park Com'rs v. Baldwin, 162 Ill. 87, 44 N. E. 404; Consumers' Co. v. City of Chicago, 313 Ill. 408, 145 N. E. 114; Elsenau v. City of Chicago, 334 Ill. 78, 165 N. E. 129; City of Chicago v. Northern Paper Stock Co., 337 Ill. 194, 168 N. E. 884; City of Chicago v. Schultz, 341 Ill. 208, 173 N. E. 276; People ex rel. v. Marshall Field & Co., 355 Ill. 633, 189 N. E. 885.

The ordinance in question here is based upon the Municipal Ownership Act of Illinois. Section 3 (Smith-Hurd Ann. St. Ill. c. 111⅔, § 98) is as follows: "No city shall proceed to acquire or construct any public utility under the provisions of this act until an ordinance of the city council providing therefor has been duly passed and submitted to the electors of such city and approved by a majority of those voting thereon. Such ordinance shall set forth the action proposed, shall describe the plant, equipment and property proposed to be acquired or constructed, and shall provide for the issue of bonds, mortgage certificates or special assessment bonds, as hereinafter authorized."

Thus we find early in the act what apparently is a mandatory limitation upon the city to issue securities for the purchase or construction of a utility in only three ways,

namely: by the issuance of bonds, mortgage certificates or special assessment bonds. The ordinance proposes to construct the utility "without the issuance of any bonds but by means of public utility certificates." Thus far, it would seem that there could be no question that the city is limited in its power to issue certificates to the issuance of mortgage certificates. The real controversy is as to the construction of section 9 of the act (Smith-Hurd Ann. St. Ill. c. 111⅔, § 104) as follows: "For the purpose of acquiring any such public utility or the property necessary or appropriate for the operation thereof, or any part thereof, either by purchase, condemnation or construction, any city may issue and dispose of interest bearing certificates, hereinafter called public utility certificates, which shall, under no circumstances, be or become an obligation or liability of the city or payable out of any general fund thereof, but shall be payable solely out of the revenues or income to be derived from the public utility property for the acquisition of which they were issued. Such certificates shall not be issued and secured on any public utility property in an amount in excess of the cost to the city of such property as hereinbefore provided and ten (10) per cent of such cost in addition thereto. In order to secure the payment of any such public utility certificates and the interest thereon, the city may convey, by way of mortgage or deed of trust, any or all of the public utility property acquired or to be acquired through the issue thereof; which mortgage or deed of trust shall be executed in such manner as may be directed by law for the acknowledgement and recording of mortgages of real estate, and may contain such provisions and conditions not in conflict with the provisions of this act as may be deemed necessary to secure the payment of the public utility certificates described therein. Any such mortgage or deed of trust may carry the grant of a privilege or right to maintain and operate the public utility property covered thereby, for a period not exceeding twenty (20) years from and after the date such property may come into the possession of any person or corporation as the result of foreclosure proceedings; which privilege or right may fix the rates or charges which the person or corporation securing the same as the result of the foreclosure proceedings shall be entitled to charge in the operation of said property for a period not exceeding twenty (20) years. Whenever and as often as default shall be made in the payment of any public utility, certificates issued and secured by a mortgage or deed of trust, as aforesaid, or in the payment of the interest thereon when due, and any such default shall have continued for the space of twelve (12) months after notice thereof has been given to the mayor and comptroller, it shall be lawful for any such mortgagee or trustee, upon the request of the holder or holders of a majority in amount of the certificates issued and outstanding under such mortgage or deed of trust, to declare the whole of the principal of all such certificates as may be outstanding, to be at once due and payable, and to proceed to foreclose such mortgage or deed of trust in any court of competent jurisdiction. At a foreclosure sale, the mortgagee or the holders of such certificates may become the purchaser or purchasers of the property and the rights and privileges sold, if he or they be the highest bidders. Any public utilities acquired under any such foreclosure shall be subject to regulation by the corporate authorities of the city to the same extent as if the right to construct, maintain and operate such property had been acquired through a direct grant without the intervention of foreclosure proceedings: Provided, however, that no public utility certificates shall ever be issued by any city under the provisions of this act unless and until the question of the adoption of the ordinance of the city council authorizing the issue thereof shall first have been submitted to the electors of such city and approved by a majority of the qualified voters of the city voting upon such question. The question shall be submitted in such form as the city council may by ordinance designate."

In this section the Legislature has provided that in order to secure the payment of such public utility certificates, the city "may convey" by way of mortgage any or all of the utility property acquired or to be acquired. The act proceeds then to a definition of the mortgagor's and mortgagee's rights. It creates in the mortgagee a remedy, allowing, in case of default, foreclosure and purchase of the property by the mortgagee.

Other sections provide that the construction may be financed by general bonds or special assessment bonds. There is no section discussing any rights or remedies of holders of certificates unsecured by mortgage, but the act is silent as to any

such security. Section 9, the only section dealing with certificates, recognizes only one class—those secured by mortgage; provides only one remedy—foreclosure of the mortgage.

The Legislature, however, used the word "may" rather than "shall," saying that the city "may convey" the property by way of mortgage.

█ The correct construction of the act must be determined from a consideration of the entire statute, and where the intention can be collected, words may be modified, altered, supplied, or disregarded, if such action is reasonably implied, so as to obviate any repugnance or inconsistency with the intention, as disclosed by the entire act. See Lewis' Sutherland Stat. Const. (2d Ed.) vol. 2 at p. 724; Lawton v. Sweitzer, 354 Ill. 620, 188 N. E. 811.

Following this rule the courts have repeatedly ruled that the word "may" means "must" or "shall" in cases where the public interest is concerned and where the public or third persons have a claim de jure that the power should be exercised. Thus, where the statute provided that a sheriff "may take bail," it was construed to mean that he "shall" do so. Malcom v. Rogers, 5 Cow. (N. Y.) 188, 15 Am. Dec. 464, cited in Schuyler Co. v. Mercer County, 4 Gilman (9 Ill.) 20. In Brokaw v. Commissioners of Highways, 130 Ill. 482, 22 N. E. 596, 6 L. R. A. 161, the court held that a provision that the commissioner "may remove such fence" was mandatory and that the word "may" should be construed to mean "shall." In Binder v. Langhorst, 234 Ill. 583, 586, 85 N. E. 400, the court said that the word "may," used in the Levee Act, where it was provided that the commissioner might levy taxes, should mean "shall." In People ex rel. v. Commissioners, 270 Ill. 141, 110 N. E. 347, the court interpreted a provision that the commissioner "may" reduce the width of a road to be mandatory. Similar instances are found in James v. Dexter, 112 Ill. 489; People v. Turnbull, 184 Ill. App. 151; People v. Elgin Home Ass'n, 359 Ill. 379, 194 N. E. 584; Chicago & A. R. Co. v. People, 163 Ill. 616, 45 N. E. 122; Grove v. Board of Supervisors, 246 Ill. App. 241.

█ Remembering that municipal corporations have only such power as is granted to them by the Legislature, that that body has seen fit to provide that utility plants may be purchased or constructed under only

three different methods of finance, that unsecured certificates are not included within said authorization, that the only remedy given the certificate holder is that of foreclosure of the mortgage, that the act indicates no intention of the Legislature to grant to the municipality authority to issue certificates other than those secured by mortgage, in view of the rules governing statutory construction, the court is imperatively driven to conclude that there is no authority in a municipal corporation in Illinois to finance the construction of a utility plant, except by general bonds, special assessment bonds, or mortgage certificates.

It is urged that no good purpose is served by such construction. To this I cannot accede; rather it seems apparent that the Legislature had a legitimate and substantial purpose. In the first place, the organization and operation of a utility, serving the residents of a city, is a private enterprise, which may or may not be a commercial success. If the venture be a failing one, default in payment follows. If the city is to finance such certificates upon a sound basis and attract prudent investors at a reasonable rate of interest, it is desirable that in case of default, these investors have an adequate remedy. Otherwise they will not purchase, and the city will be damaged by being compelled to sell its certificates on a speculative basis, at a high rate of interest. Consequently, it is a matter of protection to the city and its inhabitants and the investing public, that the utility stand as security for the obligation, and that the certificate holders have a specific remedy, least harmful to the city. The legislative recognition of this, demonstrated by making provision for a franchise to, and the rates to be charged by, the purchaser at foreclosure is demonstrative of sound legislative policy.

Defendants, however, contend that the court should so construe the act as to include permission to issue certificates other than those secured by mortgage. They would have the court extend the legislative enactment to include a provision authorizing financing by unsecured certificates. This suggestion, it seems to the court, does violence to the rule that the intention of the Legislature must be determined from consideration of the entire act and the powers of the city limited to what is contained within the same; and I do not find that the authorities cited controvert the soundness of this conclusion. Thus, in the City

of Springfield v. Springfield R. Co., 296 Ill. 17, 129 N. E. 580, relied upon by defendants, the improvement was one proposed under the Local Improvement Act, another statute, the provisions of which differ from those of the Municipal Ownership Act. The court expressly held that the ordinance was not within the terms of the latter act, but within the former. In Huggins v. City of Pinckneyville, 239 Ill. App. 213, Merchants' Loan & Trust Co. v. Chicago, 264 Ill. 76, 105 N. E. 726, the courts grounded their decisions upon the proposition that certain other acts of the Legislature were in pari materia with the Municipal Ownership Act and accordingly affected the power granted in the latter. I find no decisions in Illinois which persuade me that the Municipal Ownership Act should be enlarged beyond its language, to include power in the city, which I do not find implied by anything in the act.

■ The ordinance fails to comply with the statute in another respect. The city proposes to use an electric distribution system, previously acquired at a cost of $25,000. The ordinance pledges the revenue to be derived therefrom for the payment of the cost of the new plant. By reference to the statute we find that certificates "shall be payable solely out of the revenues or income to be derived from the public utility property for the acquisition of which they were issued." Thus the ordinance ignores a direct limitation upon the power of the city in the issuance of certificates. It would give to investors certificates payable, not only out of the revenues of the plant to be acquired with the proceeds of certificates, but, in addition, out of the revenues to be derived from the distribution system already owned and now a part of its municipal assets. This clearly is beyond the statutory power of the city.

■ Plaintiff contends further that the facts immediately last discussed, in connection with others, work an increase of the authorized indebtedness of the city beyond its constitutional and statutory limitations of 5 per cent. and 2½ per cent. respectively. If all the contentions in this respect are correct, each of the limitations is exceeded. Consequently it is necessary to examine the various items which, it is claimed, contribute to such result.

Besides the pledge of income of property already owned as an item of excess indebtedness, plaintiff contends that the obligation of the city to electrify its water-works plant at a cost to be paid from its corporate funds is an element contributing to an illegal excess of indebtedness. Under the terms of the ordinance and contracts, this additional equipment will likewise be used in the plant and the income therefrom becomes a part of the pledged income applicable to the payment of certificates.

The city further contracts to contribute $5,000 from its corporate funds and to maintain the same for a period of five years. Under the ordinance, the city is bound also to extend the distribution system in and upon the public streets at its own cost, and the revenue from this extension likewise passes as security for certificates, so that income is derived in part at least from the use of the streets and alleys of the city.

It is further contended that an inevitable result of the ordinance is to make the city a guarantor and general obligor of all obligations contained therein and in the contract with the Administrator.

That the contract of the city to electrify its waterworks and pay therefor from its corporate funds is a general obligation within the meaning of the decisions of the Supreme Court of Illinois is too clear to require comment. The same is true with reference to the contribution of $5,000. But these two items, in themselves, do not exceed the indebtedness beyond the legal limitation.

■ With reference to the use and extension of the distribution system belonging to the city and the pledge of the revenues therefrom, some consideration is necessary. In City of Joliet v. Alexander, 194 Ill. 457, 62 N. E. 861, the court held that certificates are a general indebtedness of the city, if the city mortgages any property in addition to that purchased or constructed with funds derived from certificates or if it pledges the income from such additional property. There the city proposed to construct a utility and to raise the money for doing so by mortgaging the existing plant and pledging the income from the entire system, both old and new. Such indebtedness, the court said, is a general indebtedness. In Lobdell v. City of Chicago, 227 Ill. 218, 81 N. E. 354, the court adhered to the same rule, saying that such obligation becomes an indebtedness, for the reason that the city will be compelled to pay it either by giving up the property or the income from the property, which it already has. The court held specifically that

street railway certificates create an indebtedness against the city when secured by a mortgage or trust deed on the street railway property together with a right to operate such railway for a period of twenty years after a foreclosure sale, and the mere fact that the certificates preclude the holder from bringing an action against the city does not prevent them from creating an indebtedness against the city where property of the city other than the tangible property and its income purchased with the proceeds of sale of such certificates is pledged to secure the payment of the certificates. To the same effect are Village of East Moline et al. v. Charles H. Pope, 224 Ill. 386, 79 N. E. 587; Schnell et al. v. City of Rock Island et al., 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874; Leonard v. City of Metropolis, 278 Ill. 287, 115 N. E. 813.

At apparent odds with these authorities is that of Ward v. City of Chicago, 342 Ill. 167, 173 N. E. 810, following Maffit v. City of Decatur, 322 Ill. 82, 152 N. E. 602. There the court was interpreting another act, dealing with cities of a population of 500,000. The city had proposed to borrow money to extend its water and pledge the revenues from the entire system for the purpose of paying existing indebtedness and the cost of the new improvement. The court held that such was not a general indebtedness. I deem it most material that the present statute was not before the court and that there the city pledged the income from the entire plant, including extensions, not only to secure new financing, but also to take care of existing previously created legal indebtedness. This fact may have compelled the court to distinguish the prior cases; and I do not find any authority for the doctrine that revenues from an existing plant may be pledged in violation of the express terms of the statute for the purpose of paying only the cost of construction and operation of a new plant without making the certificates an indebtedness of the city. Such illegal act upon the part of the city is either void because contrary to statute or creates a general indebtedness. Nor do I believe that City of Jerseyville, Ill. (C. C. A.) v. Connett, 49 F.(2d) 246, of this Circuit militates against the rule. The court there dealt with a completed contract; it was not concerned with the legality of a proposed act.

A similar question arose in City of Campbell v. Arkansas-Missouri Power Co. (C. C. A. 8) 55 F.(2d) 560, 563. There the city contracted for the purchase of certain equipment for a municipally owned utility, promising to pay for the same by certificates, payable out of the revenues of the plant already owned. The contract was for additional machinery and equipment to the extent of $62,000. The court held that these certificates created an obligation beyond the constitutional power of the city, saying: "The machinery sold to the city, as has been pointed out, does not constitute the entire plant which generates and distributes the electric current and produces the revenue for such service. * * * The purchase price, under the provisions of this contract, is not to come alone from the earnings of the property sold. Under such circumstances, the obligation to pay the income of the property other than that purchased is not different from an obligation to pay with any other funds. Bell v. City of Fayette, 325 Mo. 75, 28 S.W.(2d) 356, 360; Schnell v. City of Rock Island, 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874; Feil v. City of Cœur d'Alene, 23 Idaho, 32, 129 P. 643, 43 L. R. A. (N. S.) 1095; City of Ottumwa v. City Water Supply Co. (C. C. A.) 119 F. 315, 59 L. R. A. 604; Hesse v. City of Watertown, 57 S. D. 325, 232 N. W. 53; State v. McMillan, 12 N. D. 280, 96 N. W. 310; Wilder v. Murphy, 56 N. D. 436, 218 N. W. 156. * * * Notwithstanding the skillful attempt to evade the constitutional inhibition against the creation of indebtedness, we think it clear that the subterfuge resorted to does not have that effect, and that the lower court properly held that the contract was void. The judgment appealed from is therefore affirmed." See, also, Hight v. City of Harrisonville, 328 Mo. 549, 41 S. W.(2d) 155.

I approve the doctrine that a municipal corporation, governed by a statutory limitation upon its right to incur indebtedness, must, in determining whether that limitation has been reached, include contracts pledging the income from previously owned property as well as the income from property acquired to secure the payment of certificates issued for the acquisition of the additional property. It follows in the present case that the pledge of the city of the revenues from its existing plant or other property must be included in determining the amount of general indebtedness of the city. Under the figures submitted, in the

present instance, this inclusion produces an illegal excess.

Plaintiff contends further that the ordinance inevitably makes the city a guarantor of the entire obligation of the certificates and thus creates a general indebtedness as to the whole amount of the cost. Section 17 of the ordinance provides that it shall constitute a contract between the city and the holders of the certificates. Section 3 provides for certificates to the amount of $477,000 and interest. The entire revenue from operation must be deposited in a separate fund designated as an "electric fund," and it is stipulated that there shall be separate accounts in that fund, designated as "operation and maintenance account" and "certificate account," and that on the first day of each month, from the electric fund there shall be paid into the operating account, first, a sufficient sum to pay the expense of operation and maintenance; and, second, into the certificate account an amount equal to $\frac{1}{6}$ of the interest due the next succeeding interest payment date, plus an amount, equal at least to $\frac{1}{12}$ of the principal of certificates becoming due on the next succeeding maturity date.

Section 16 provides that while the certificates remain outstanding, the rates fixed and charged shall be such as are adequate to produce a revenue sufficient to pay the cost of operation and maintenance of the plant and principal and interest on the certificates; that there shall be charged to all consumers such rates as shall be adequate to meet the requirements, and that the city shall pay reasonable compensation for electricity furnished the city into the electric fund.

Section 10 provides that until the accumulated revenues shall be equal to the principal requirements on the certificates for 24 months, there shall be an extra 20 per cent. of the requirements paid into the account and held as a reserve. If on the first of any month the amount in the electric fund is not sufficient to provide for all payments into the certificate account, the deficiency shall be paid the next month. The city agrees to perform fully all its duties under the ordinances, including the making and collecting of sufficient rates, and covenants that it will not sell, lease, mortgage, or in any manner encumber the property or pledge the revenues until the certificates have been fully paid; that it will maintain in good condition and con-

tinuously operate the utility so long as the certificates are outstanding; that it will keep the plant insured out of the revenues from the plant. The last condition does not apply to the operation and maintenance funds, however.

Obviously, if the city should fail to operate the plant or fail to charge and collect a sufficient amount from the operation to meet the interest and principal installments, or if it should violate any of the other covenants or provisions of the ordinance, it will have broken its contract, and for breach of its covenants the certificate holders might have a legal right of action for the resulting damages. This is persuasive that, by such provisions and covenants, the city becomes a guarantor of the certificates, thereby creating an indebtedness on the part of the city for the full amount of $477,000, far in excess of the constitutional and statutory limitation.

Miller v. Buhl, 48 Idaho, 668, 284 P. 843, 72 A. L. R. 682, is authority for the doctrine that an agreement upon the part of the city to maintain adequate rates for a long period of time, sufficient to discharge an indebtedness, cannot be enforced, for the reason that it takes away from the city the right to control rates. But it seems that, under the statute of Illinois, such an agreement is merely a contract to do what the statute requires, and I doubt, therefore, the applicability of the doctrine to the present case.

Plaintiff contends that the undertaking of the city contained in the ordinance and contract to fix rates which will produce a definite sum of money within a period of 25 years and to maintain and operate a utility for 25 years violates the Constitution of Illinois with regard to debt limitations. The theory is that such a contract becomes a general obligation of the city, and is therefore an indebtedness to be included in determining whether the limitation has been reached.

It is true that, so far as governmental activities are concerned, a contract to levy a certain tax or to do some specific act effectuates a general indebtedness, for such is a contract in derogation of the legislative discretion of the council and its successors. City of Springfield v. Edwards, 84 Ill. 626; City of Chicago v. McDonald, 176 Ill. 404, 52 N. E. 982; Schnell v. City of Rock Island, 232 Ill. 89, 83 N. E. 462, 14 L. R. A. (N. S.) 874. However, the Illinois limitation upon indebtedness, as I con-

strue the decisions, is limited to acts of the city surrendering discretion in its governmental or legislative capacity, and does not apply to promises to perform its statutory duty in conducting a proprietary business.

McQuillan, in Municipal Corporation, vol. 3, § 1356, p. 952, points out the distinction in this respect between governmental action and proprietary action. A city may, in its governmental capacity, do nothing which limits the legislative power of the successors of the existing official body, but in its contracts for public utilities, so far as private affairs are involved, rather than legislative or governmental powers, the city may bind itself beyond the term of office of the officials making the contract. Columbus Water-Works Co. v. City of Columbus, 48 Kan. 99, 28 P. 1097, 15 L. R. A. 354; City of Holton v. Kansas Power & Light Co., 135 Kan. 58, 9 P.(2d) 675; Illinois Trust & Savings Bank v. Arkansas City, 76 F. 271, 34 L. R. A. 518 (C. C. A. 8); Reed v. City of Anoka, 85 Minn. 294, 88 N. W. 981; City of Gadsden v. Mitchell, 145 Ala. 137, 40 So. 557, 6 L. R. A. (N. S.) 781, 117 Am. St. Rep. 20; Eau Claire Dells Imp. Co. v. City of Eau Claire, 172 Wis. 240, 179 N. W. 2. In City of Vincennes v. Citizens' Gas Light Co., 132 Ind. 114, 31 N. E. 573, 577, 16 L. R. A. 485, the court said: "Whatever may be the law in other jurisdictions, this court is committed to the doctrine that a city has power to contract for a supply of gas or water for a stated period of time extending beyond the tenure of office of the individual members of the common council making such contract. City of Indianapolis v. Indianapolis, etc., Co., 66 Ind. 396; City of Valparaiso v. Gardner, 97 Ind. 1 [49 Am. Rep. 416]. * * * The making of contracts for the supply of gas or water is a matter delegated to the governing powers of municipalities, to be exercised according to their own discretion; and, in the absence of fraud, while acting within the authority delegated to them, their action is not subject to review by the courts." With the reasoning of these cases, the court is in accord. The city may not contract to pay a certain rate throughout a term of years, regardless of reasonableness, for such is a surrender of its governmental power. It may, however, make a valid agreement to buy current and pay statutory "adequate" rates therefor over a long period. This conclusion is entirely applicable also to that covenant whereby the city binds itself not to sell, loan, or lease the proposed plant for 25 years.

Plaintiff insists that the city has delegated its legislative and governmental functions in the fixing of rates, the making of charges and the control and management of the construction and operation of the utility. Consequently, it is necessary to observe with some care, the provisions and conditions of the contract. It provides that the determination of the Administrator of the cost of the labor and materials "shall be conclusive"; that the requisition to the government must be "satisfactory in form and substance to the Administrator"; that upon approval of the requisition, the government will take up and pay for bonds of maturities "satisfactory to the Administrator" and in such amount as will provide "in the judgment of the Administrator" sufficient funds for the construction. The government is under no obligation to take up bonds beyond the amount "in the judgment of the Administrator" necessary to complete the project.

It is provided that the money shall be expended for only such purposes "as shall have been approved by the Administrator"; that the work shall be accomplished in accordance with plans, drawings, specifications, and construction contracts "which shall be satisfactory to the Administrator" and under such engineering supervision and inspection "as the Administrator may require." The city agrees to buy no material or equipment subject to any condition of sale or title "except with the written consent of the Administrator." The Administrator is under no obligation if "in the judgment of the Administrator" the financial condition of the borrower shall have changed unfavorably in a material degree; "if the Administrator shall not be satisfied" that the borrower will be able to complete the construction for the sum borrowed "in a manner satisfactory to the Administrator"; or if "in the opinion of the Administrator," which shall be "conclusive," the borrower shall delay for an unreasonable time in carrying out any of the duties or obligations.

It is a condition that the city must be able to complete the project in a "manner satisfactory to the Administrator"; that the "Administrator shall be satisfied" as to all legal matters and proceedings; that the ordinance shall be "satisfactory to the Administrator"; that the city shall, "in a manner satisfactory to the Administrator,"

set aside funds to electrify its waterworks pumping equipment; and that the city shall deposit $5,000 in a separate account to help in the expense of operation and maintenance.

In part 2 of the contract it is provided that all work shall be done "subject to the rules and regulations adopted by the Administrator." Thus, the Administrator is made the final exclusive judge of what shall be done in the entire construction work in the details of labor, wages, hours of employment, all of which may be dictated by the Administrator and as to none of which the city council reserves any discretion.

The contract provides for compliance with the National Industrial Recovery Act (48 Stat. 195) and requires the contractor to comply with the Code thereunder to which he is subject. The right to cancel the contract on account of failure to comply with these provisions is reserved. No materials can be purchased or any subcontract entered into for materials or supplies, which are produced or furnished, in whole or in part, by any person who shall not certify that he has complied with the provisions of said act. In view of the fact that the Supreme Court has in the recent case of Schechter Poultry Corp. v. U. S., 55 S. Ct. 837, 79 L. Ed. 1570, 97 A. L. R. 947 (May 27, 1935) decided that the pertinent sections of the act are in violation of the Constitution, it would seem that such a condition is not valid.

It is provided that the Administrator shall have the right to inspect all work as it progresses; that reports of the progress shall be given; that the approval thereof by the Administrator shall be a condition precedent to the advancement of funds; that the inspector shall be provided reasonable facilities, and that in case of dispute the government engineer "shall determine the reasonableness of the request." No bid can be received from any subcontractor who has not filed certificate of compliance with United States Government P. W. A. No. 61. Termination of the contract is made subject to approval by the government engineer or the representative of the Administrator.

The contract provides further that the borrower shall receive no bid from any contractor or subcontractor who has not signed United States Government P. W. A. No. 61. The bond for the performance of the contract and the liability insurance must be "satisfactory to the Administrator."

From a perusal of the contract, it clearly appears that the purpose is to make the Administrator exclusive arbiter of what is to be done and how it is done, and to grant to him all such discretion as the city has with regard to the construction of this plant, contracting therefor and letting of subcontracts. Bidders are limited to a certain specific class; the city surrenders its discretion as to the terms upon which it may contract for labor and material.

The court is not here concerned with the question of wisdom of action granting to the Administrator such exclusive power. The judiciary, in performing its functions, may not block the path laid out by the executive department because it does not approve the route, and I have no right or desire to attempt to extend the functions of the court beyond those which have to do solely with questions of legality. It may be that each and every provision and condition provided in this contract is dictated by wise humanitarian purposes, but if illegality permeates the transaction, the court may not put the stamp of judicial approval upon the same, merely because of a desire to further humanitarian policies. Legislation and human action, whatever its economic or social value, must, under our system of government, accord with the basic law of the state.

Under the laws of Illinois, cities have, as we have seen, certain delegated legislative power, which they receive from the Legislature and which they exercise as creatures of the Legislature. Their authority is limited by the terms of the delegation. Such legislative power, when delegated to a city, can in no way be redelegated by it to third persons. The city alone may exercise the delegated legislative discretion and if it sees fit not so to do, it may not give it to others. Nor, for the same reason, may the Legislature delegate its functions to other than its own arms. Its authority over municipalities was reserved with manifold others to the state, under the Constitution of the United States. All such reserved sovereign power, lodged in the people of the state, not granted in the Federal Constitution, remains where lodged, and no statute or resolution of the state legislative body, no declaration of the executive officers of the state, can effect a valid grant of that sovereign power to a third person, even though he be a national officer. I know of no method by which such sovereign powers, reserved as they are to

the state, may be granted to the United States except by amendment to the United States Constitution, regularly adopted, whereby the people of the state grant additional power to the federal government.

That the courts in Illinois and elsewhere quite generally agree that the Legislature may not make a valid delegation of discretion, vested in the Legislature and its constitutional agencies, is apparent from the analysis of the decisions. Thus, in People v. Sholem, 294 Ill. 204, 128 N. E. 377, 380, the court declared unconstitutional an act of the Legislature which gave to the fire marshal the right to declare whether a building was "legal" and what should be done with it, saying: "The fire marshal is given the power arbitrarily to determine, * * * where the line of demarkation is in any case. By his decision the property rights of individual citizens may be taken away without just compensation or due process of law, as required by the Constitution. * * * The Legislature cannot delegate to a single officer the power to arbitrarily determine the property rights of citizens in this manner."

In People v. Yonker, 351 Ill. 139, 184 N. E. 228, 230, the court declared unconstitutional a statute which gave to the city clerk discretion to determine when licenses should be issued, without prescribing a standard, saying: "It is therefore left to the clerk to determine not only whether there was a compliance with the law but what the law is. * * * If [the law] leaves to a ministerial officer the definition of the thing to which the act is to be applied, * * * it is invalid 'as an unwarranted and void delegation of legislative power."

In Schireson v. Walsh, 354 Ill. 40, 187 N. E. 921, 924, the court declared unconstitutional a statute which gave to an administrative department the power to determine what constituted a prima facie case against a physician, saying: "The department * * * is not a court. It has no judicial powers. It is merely an agency of the legislative department of the state. The attempted unconstitutional delegation to it of the power to determine, in the first instance, what constitutes a prima facie case against a physician, without any legislative enactment setting forth facts constituting a cause for the revocation or suspension of the license of a licensee under that department, gives it no jurisdiction or authority."

In People v. Beckman & Co., 347 Ill. 92, 179 N. E. 435, 437, the court held unconstitutional a law which gave to the secretary of the state the power to prescribe terms of bonds not specified in the statute, saying: "Such authority, under the Constitution, cannot be delegated to that officer. * * * A law which vests an administrative officer with a discretion which is purely arbitrary and which may be exercised in the interest of a favored few is invalid."

In People v. Barnett, 344 Ill. 62, 176 N. E. 108, 110, 76 A. L. R. 1044, the court held unconstitutional a law which permitted judges to appoint jury commissioners and prescribe their duties and powers, saying: "All the legislative power inherent in the people of the state of Illinois has been vested in the General Assembly, except in those cases in which the power has by express limitation or necessary implication been withheld. Since it alone has the power, the General Assembly has also the duty, and upon it alone rests the full responsibility, of legislation. This power it may not delegate to any other officers or persons or groups of persons, or even to the whole body of the people. * * * The people, in whom it resided, have voluntarily relinquished its exercise, and have positively ordained that it shall be vested in the General Assembly. It can only be reclaimed by them, by an amendment or abolition of the constitution, for which they alone are competent. * * * 'Under a well-balanced constitution, the legislature can no more delegate its proper function than can the judiciary.'"

In Re Opinion of the Justices of the Supreme Judicial Court of Massachusetts, 239 Mass. 606, 133 N. E. 453, 454, in deciding whether a state could adopt as a state law a federal law, and the regulations thereunder as thereafter promulgated, the court said: "The enactment of laws is one of the high prerogatives of a sovereign power. It would be destructive of fundamental conceptions of government through republican institutions for the representatives of the people to abdicate their exclusive privilege and obligation to enact laws. * * * There are no exceptions to the principle that the General Court cannot delegate, surrender or transfer to any other power the function of enacting statutes general in their scope and operation. * * * No discussion is required to demonstrate that the Congress of the United

888

States cannot be treated as a subsidiary board or commission by the General Court." To the same effect is State v. Gauthier, 121 Me. 522, 118 A. 380, 26 A. L. R. 652.

█ The Legislature of Illinois on July 5, 1933, enacted a law known as "Federal Aid," by which it gives to municipalities the right to procure from the federal government loans for public work. See Smith-Hurd Ann. St. c. 29, § 25 et seq.; Cahill's Ill. Rev. St., chapter 52a, pars. 6, 7, and 8. Under section 27 (paragraph 8) the officials of a municipality are authorized to make application to procure loans and "to make any loan or enter into any contract which may be approved by the Federal Emergency Administration of Public Works or such officers and agencies empowered to act, on such terms and conditions as may be prescribed and may authorize the doing of all things and acts, and the execution of such documents and instruments, and adopt such resolutions and ordinances in connection therewith, that may be required by the Federal Emergency Administration of Public Works or such officers and agencies empowered to act to effect any sale or pledge of the warrants issued in anticipation of the collection of taxes or of the bonds of such municipalities or to procure grants in order to obtain financial aid."

Clearly the delegation of authority contemplated in this act to the Administrator to fix and control the "terms and conditions" upon which the public work of the city is to be done violates the principles laid down in the authorities quoted, and must, as it applies to the facts here involved, be held void.

█ The same reasoning controls the limitations of cities, in delegating the discretion vested in them by the Legislature. Thus in People v. Clean Street Co., 225 Ill. 470, 80 N. E. 298, 300, 9 L. R. A. (N. S.) 455, 116 Am. St. Rep. 156, concerning a grant of special authority to private individuals for the use of the streets, the Supreme Court of Illinois said: "The control over the streets and alleys of a city or village, under this statute, is very broad, and absolute power over them is vested in the municipality. But the authority is not vested in the mayor, chairman of the committee on finance, or commissioner of public works, but is conferred upon the legislative branch of the city government. In other words, it is vested in the city council, and can only be exercised by it through

ordinances duly passed. * * * 'The governing body of a municipal corporation is not at liberty to delegate to a committee, or an officer or agent, governmental, legislative, or discretionary functions confided to it by the Legislature of the state, in the absence of express authority for such delegation.' " To the same effect see Cooley's Const. Lim. (5th Ed.) p. 249, and Dillon on Mun. Corp. (3d Ed.) §§ 96, 97.

In New Orleans v. Sanford, 137 La. 628, 69 So. 35, 41, L. R. A. 1916A, 1228, discussing an ordinance which divided the city into certain health zones and gave to the health officer authority to transfer buildings from one class to another, holding the same void, quoting from 28 Cyc. 276, the court said: " 'Since all governmental power is held in trust by the state for the benefit of the public, it has been generally denied that such power can be delegated by the state to anybody.' * * * The board of health could not delegate to a subordinate the power to create exceptions to any rule it had established, or, which is the same thing, the power to stay the operation of any rule in cases falling within the terms of its ordinances."

In Zable v. Louisville Baptist Orphans' Home, 92 Ky. 89, 17 S. W. 212, 213, 13 L. R. A. 668, where the ordinance delegated to an engineer the right to fix the grade of an improvement, the court said: "The council could not abdicate its legislative power in this respect, and, leaving the matter to the judgment, or, perhaps, whim, of the city engineer or the contractor, subject the property of the abutting owner to whatever the improvement might cost. This would leave him largely at the mercy of an irresponsible, and, perhaps, interested party. The city, by its charter, has power to improve its streets as may be prescribed by ordinance. The power is a legislative one, and the kind and character of the improvement must be fixed by the city council." See, also, McCrowel v. Bristol, 89 Va. 652, 16 S. E. 867, 20 L. R. A. 653; State v. City of Trenton, 51 N. J. Law, 498, 18 A. 116, 5 L. R. A. 352, and County Board v. Durham et al., 198 Ky. 733, 249 S. W. 1028. To the same effect are Stifel v. Hannan, 95 W. Va. 629, 123 S. E. 428, and Lawrence v. Portland, 85 Or. 586, 167 P. 587.

The rule is well stated in Cooley's Constitutional Limitations, vol. 1, 224, and 437 as follows:

"Where the sovereign power of the State has located the authority, there it

must remain; and by the constitutional agency alone the laws must be made until the constitution itself is changed. The power to whose judgment, wisdom, and patriotism this high prerogative has been intrusted cannot relieve itself of the responsibility by choosing other agencies upon which the power shall be devolved, nor can it substitute the judgment, wisdom, and patriotism of any other body for those to which alone the people have seen fit to confide this sovereign trust."

"The municipality has no power, even by contract, to control and embarrass its legislative powers and duties."

Chief Justice Marshall's opinion in Clark v. Washington, 12 Wheat. 40, 6 L. Ed. 544, is directly in point.

It seems clear to me, therefore, that, wholly aside from the question of wisdom of the proposed action, despite any praiseworthiness of the motives attributed to the city or the Administrator, this court cannot approve a delegation, by the state or the city, of legislative authority or discretion to the Administrator or his agents. The determination of all questions of discretion, all conditions upon which the work shall be done, all statements of reasonable clauses for the protection of the city and its inhabitants must be left to the council, not to a third person.

■ The contract with the Administrator, providing as it does for letting of public contracts, lacking in the essentials of free competitive bidding, cannot be approved. The public policy of Illinois, with respect to competitive bidding on public contracts, is demonstrated in numerous instances by acts of the Legislature in providing for the letting of such contracts to the lowest responsible bidder, after competitive bidding, such as City Supplies, Smith-Hurd Ann. St. Ill. c. 24, § 65.93; Ill. Rev. St. c. 24, par. 65 (94); Drainage Districts, Smith-Hurd Ann. St. Ill. c. 42, § 36; Rev. St. c. 42, par. 36; Ditches, Smith-Hurd Ann. St. Ill. c. 42, §§ 117, 118; Rev. St. c. 42, pars. 155, 156; Local Improvement Contracts, Smith-Hurd Ann. St. Ill. c. 24, §§ 129, 780, 783, 787; Rev. St. c. 24, pars. 121, 204, 207, 211; Penitentiary Contracts, Smith-Hurd Ann. St. Ill. c. 108, § 28; Rev. St. c. 108, par. 28; Sanitary Districts, Smith-Hurd Ann. St. Ill. c. 42, §§ 269, 287, 310, 331; Rev. St. c. 42, pars. 285, 303, 327, 348; Roads and Bridges, Smith-Hurd Ann. St. Ill. c. 121, § 30; Rev. St. c. 121, par. 30; Departmental Contracts, Smith-Hurd Ann. St. Ill. c. 127, § 28; Rev. St. c. 24a, par. 28; Printing and Binding Contracts, Smith-Hurd Ann. St. Ill. c. 127, §§ 64, 68, 76, 109; Rev. St. c. 127, pars. 1, 5, 13, 46; Township Roads, Smith-Hurd Ann. St. Ill. c. 121, §§ 124, 127; Rev. St. c. 121, pars. 125, 128, and many others.

In Smith-Hurd Ann. St. Ill. c. 24, § 319; Rev. St. c. 24, par. 377, covering Cities, appears the following language: "All contracts, of whatever character, pertaining to public improvement, or the maintenance of public property of any city or village, involving an outlay of as much as five hundred dollars ($500.00), shall be based upon specifications to be prepared and submitted to, and approved by the council, and after approval by the council, advertisement for the proposed work. * * * The council shall determine the most advantageous bid for the city, and shall enter into contract with the party submitting the lowest secure bid."

By Smith-Hurd Ann. St. Ill. c. 38, § 139; Rev. St. c. 38, par. 116, it is made a crime to conspire to prevent competitive bidding in the letting of public contracts.

Evidently the Legislature has at all times attempted to preserve to the people their right to have public contracts let to the lowest responsible bidders. With this public policy and the statutes in force, no city can legally agree to let a contract for construction of public work only to bidders who shall have complied with an unconstitutional act of Congress and the codes promulgated in pursuance of such invalid act.

In Holden v. City of Alton et al., 179 Ill. 318, 53 N. E. 556, 557, speaking of an ordinance which required that the person with whom a city might contract should be a member of a certain organization, the Supreme Court of Illinois said: "The council cast upon the taxpayers an increased burden, contrary to the provisions of the statute and ordinance, solely because it had entered into a combination, with a certain class of persons doing printing, to restrict the privilege of bidding to such class instead of leaving it open to all citizens upon like conditions. Such a combination or agreement is in violation of common right, tends to create a monopoly, and cannot be tolerated. * * * There is here an unequivocal admission of an arbitrary exclusion from the privilege of contracting with the city, or laboring for it, of a portion of the citizens, for the sole reason that

they are not members of an association. * * * The refusal on such ground was merely the imposition of a greater burden on the taxpayers, through an attempted abuse of power."

Where the ordinance required a certain kind of asphalt, procurable from only one person, the court, in Fishburn v. City of Chicago, 171 Ill. 338, 49 N. E. 532, 39 L. R. A. 482, 63 Am. St. Rep. 236, said: "It is a well settled general rule that all contracts, in which the public are interested, which tend to prevent competition, whenever a statute or known rule of law requires competition, are void."

In Adams v. Brenan et al., 177 Ill. 194, 52 N. E. 314, 316, 42 L. R. A. 718, 69 Am. St. Rep. 222, in discussing the right of a board of education to limit bidders to a certain class of labor, the Supreme Court of Illinois said: "The rule adopted by the board and included in this contract is a discrimination between different classes of citizens, and of such a nature as to restrict competition. * * * There is no more reason or justification for such a contract as this than there would be for a provision that no one should be employed except members of some particular party or church. In any such case it might be said that the board entertained a bona fide opinion that the members of some political party were more intelligent and better capable of performing the work, so that better results would be attained; or that the members of a church, on account of their higher standard of morality, would more faithfully and conscientiously carry out the contract. The fact that the board may have been of the opinion that its action was for the benefit of the public cannot afford a justification for limiting competition in bidders, and requiring them to abandon the right to contract with whomsoever they may choose for the performance of the work. * * * There is another ground upon which complainant has an undoubted right to maintain the bill, and that is that the contract tends to create a monopoly, and to restrict competition in bidding for work. The board of education may stipulate for the quality of material to be furnished and the degree of skill required in workmanship; but a provision that the work shall only be done by certain persons or classes of persons, members of certain societies, necessarily creates a monopoly in their favor. The effect of the provision is to limit competition by preventing con-

tractors from employing any except certain persons, and by excluding therefrom all others engaged in the same work, and such a provision is illegal and void." See, also, Fiske v. People, 188 Ill. 206, 58 N. E. 985, 52 L. R. A. 291; McChesney v. People, 200 Ill. 146, 65 N. E. 626.

In Bohn v. Salt Lake City et al., 79 Utah, 121, 8 P.(2d) 591, 602, 81 A. L. R. 215, speaking of the surrender of authority to select labor, the court said: "One of the provisions embodied in the proposals for bids and contracts let and to be let for the construction of the work requires the contractor to employ all workmen therefor through the agency appointed, controlled, and directed by the board of commissioners. While the contractor is permitted to select workmen furnished and supplied by such agency under rules and regulations promulgated by it and approved by the board of commissioners, yet otherwise he is given no choice in the selection of his workmen, and thereby a substantial limitation and restriction is put upon competition and opportunity in obtaining labor, as well as to the character and quality of it, except as the contractor may be able to select it through those good, bad, and indifferent furnished and supplied by the agency. * * * It is conceivable, because of such and of other complained of provisions, that some responsible bidders would even decline to bid or enter into contracts to do the work under such conditions and restrictions imposed and required."

Concerning the fixing of a minimum wage to be paid by the contractor, the court said: "Let it be assumed that by the weight of judicial authority it is competent for the state, in the absence of express or implied constitutional restrictions, to fix a minimum wage for labor on all public work or improvements, or may authorize municipalities to do so. But that here does not solve the problem. * * * If, as to this provision as well as to other complained of provisions imposed in proposals for bids and in contracts let and to be let, it be said, as it is, that the board of commissioners by imposing them acted in good faith to benefit and aid a particular class, yet, must it also be noticed and not minimized nor lightly pushed aside that the primary and more important duty imposed on the board and the city in spending the taxpayers' moneys intrusted to them for a special and particular purpose was to so expend the fund as best to accomplish an

efficient and proper construction of the improvement at an economical, reasonable, and practical cost and for the benefit of the taxpayers and of the general public. The board was required to be as solicitous to promote and safeguard the interests of the general public and of the taxpayers as to promote interests of and give aid and benefit to a particular class." The court also said that if the cost of the work was increased by the provision, the complainant need not show injury, but must show merely that the condition restricted competition.

It follows that because of its provisions limiting to the city in its statutory duty to let the contract to the lowest responsible bidder, the agreement with the Administrator, requiring that bidders comply with a void act of Congress, and otherwise destructive of free competitive bidding, cannot receive the sanction of the court, bound, as it is, by the mandates of the Constitution and statutes of Illinois.

Illinois is committed to the public policy that there must be free and open bidding upon public contracts, and that such should be let to the lowest and best bidder, after due advertisement. A municipality may prescribe reasonable conditions for the protection of itself and its inhabitants, but the determination of such reasonable conditions is for itself. It may not delegate to another the right to exercise that legislative discretion, whether it be a private individual or an officer of the United States.

Plaintiff insists that the ordinance is invalid for failure to describe sufficiently the property proposed to be constructed. Section 3 of the act forbids the acquisition or construction of any public utility until after adoption of an ordinance, duly authorized by a vote of the people, which shall "describe the plant, equipment and property proposed to be acquired or constructed." The description included in sections 1 and 2 of the ordinance is found in the footnote.[1]

The Legislature directed that the people should have the right to vote upon the proposal. This was intended, apparently, to protect the inhabitants against corporate action so important as this without full authorization from the people. Obviously, the description is not such as fully to inform a voter as to just what he was voting for—just what he was authorizing. The dimensions, regulations, specifications of materials and labor, the quality and character of the building, the kind and quality of poles, wires, and transformers, and all other details of the proposed construction are undisclosed. In other words, no citizen could determine just how the city proposed to spend $477,000. It is urged that the making of the contract is a later step, but the details and specifications might easily have been placed in the ordinance

[1] "Section 1. That the City of Centralia, Marion County, Illinois, shall establish and construct within said City, a public utility, to-wit: A Municipal Electric Light & Power Public Utility, comprising a steam generating plant to produce and supply electricity for the City and its inhabitants, which shall be built upon real estate to be acquired by said City, and consisting of power-house building, boilers, and turbo-generators, with all necessary auxiliary equipment, and a complete distribution system, for the purpose of transmitting, distributing, and supplying electric energy throughout the said City of Centralia; and also such lands, tenements, easements, and other rights and interests therein, and such buildings, structures, and facilities as may be necessary and convenient for the purpose of constructing, completing, and operating such public utility, or any part thereof. * * *

"Section 2. Such steam generating plant or station shall comprise and be equipped with Two (2)-350 Horsepower Water Tube boilers, 300 pounds Gauge Working Pressure, complete with Superheaters, Forced Draft Chain Grate Stokers, foundations, Brickwork, Breeching, Masonry, Chimney, Feed Water Heaters and Boiler Feed Pumps, Necessary Steam and Water Piping, necessary Coal Bunkers, Coal and Ash Handling Equipment; Two (2) 1250 K. V. A. Turbo-Generators Surface Condensers, Circulating Water and Condensate Pumps (complete with Auxiliaries), including Foundations; Switch board and Wiring; Cooling Tower, Boiler Room and Generating Room Building of Fireproof Construction throughout, all with such auxiliaries as may be requisite.

"Such Distribution system shall comprise a system of poles, wires, transformers, and other equipment and apparatus suitable and adequate for serving all customers and users and for lighting the streets of the City of Centralia, exclusive of a 'White Way' system now existing and owned by the City."

referred to on the ballot and left on file with the city clerk so that any interested elector might upon inquiry obtain full information. The ordinance is silent as to any time or place at which any information may be obtained.

In the act governing the construction of local improvements by a city, where an ordinance must be enacted as one of the prerequisites to the construction of an improvement, it is provided that such ordinance shall contain a true "description of such improvement." The purport of such language is substantially the same as that now before us; the subject-matter is similar—the construction of a local improvement by a city. The present case involves the construction of a utility by a city, even more unusual, as to which, consequently, it would seem that the Legislature intended that the interested parties should be at least equally protected. The Supreme Court of Illinois has interpreted the language used in the Local Improvement Act, in City of Dixon v. Sinow & Weinman, 350 Ill. 634, 183 N. E. 570, 572. There the court said: "The objections urged to the foregoing provisions of the ordinance are that the composition of the concrete and the dimensions of the decks are not specified; that the number and the locations of the iron columns and pilasters, and the width of the pilasters are not fixed; and that in the estimate items of the cost of the columns and pilasters are not included. The ordinance is silent upon the composition of the concrete to be used in the construction of the decks. There is no specification of the dimensions of the decks other than their thickness. The vaults are of various sizes, but their dimensions are not given. * * * The iron columns, pilasters, and decks are manifestly component parts of the proposed improvement and the cost of each of these three items is substantial. Yet no mention of or reference to any of them is made in the estimate. It does not afford the property owner the required information and the estimate is therefore insufficient. * * * The ordinance should have given a more definite and complete description of this portion of the proposed improvement and its probable cost should have appeared in the estimate." As a consequence, the court held the ordinance invalid. Various cases upon which the court relied are cited.

In City of Chicago v. Russo et al., 339 Ill. 349, 171 N. E. 523, 524, the court said:

"The description of the improvement in the ordinance must be sufficiently definite that the property owner may know from its terms what he is to get when the improvement is complete, and what sort of an improvement his property is being assessed to construct,—in short, the property owner is entitled to know what he is to get for his money before he is required to pay for it." To the same effect are Gray v. W. A. Black Co., 338 Ill. 488, 170 N. E. 713; City of Chicago v. Huleatt, 276 Ill. 466, 114 N. E. 1021; City of Kankakee v. Dunn, 337 Ill. 391, 169 N. E. 251; City of Springfield v. Gillespie, 335 Ill. 388, 167 N. E. 61.

The only divergence from the Illinois holdings in this respect is to be found in cases considering acts where the statute expressly provides that it shall be sufficient to describe the property in a general way. There is no such limitation in the present statute. The general rule is to the same effect. Thus, in 44 C. J. 274, it is said: "The ordinance or resolution ordering an improvement must, in order to satisfy the statutory requirements, contain a clear and comprehensive description of the improvement to be made, otherwise it will be invalid as a delegation to the officer or officers who must supervise the work of improvement of a power which was exercisable only by the municipal legislature; and to do this it must generally incorporate a description of all the essential characteristics of the improvements."

And again, page 242 and 243: "The resolution or ordinance of intention must contain a clear description of the nature and extent of the proposed improvement, unless such description is incorporated into the resolution or ordinance by a reference to plans and specifications on file." See, also, City of Kirksville v. Coleman, 103 Mo. App. 215, 219, 77 S. W. 120; Turley v. Dyersville, 202 Iowa, 1221, 211 N. W. 723; Delmar Inv. Co. v. Lewis, 271 Mo. 317, 196 S. W. 1137.

This matter of description is not unimportant. A municipal corporation of Illinois may not engage in the public utility business except by a vote of the people. The Legislature has seen fit to hedge about the city's power in this respect by the requirement of a public vote; it has gone farther; it requires also that the ordinance enacted before the vote shall describe the property. Intelligent voting can result only if such description is sufficient to give the elector adequate information. The

whole purpose of the statute, that is, to authorize municipal action only after the public have had a chance to understand and pass upon it, is defeated unless the electors have adequate information about that upon which they are voting.

It is contended further that the title to the Municipal Ownership Act, "An Act to authorize cities to acquire, construct, own, and to lease or operate public utilities and to provide the means therefor," (Laws Ill. 1913, p. 455) is not sufficiently comprehensive. The Constitution of Illinois, section 13, art. 4, is, in part, as follows: "No act hereafter passed shall embrace more than one subject, and that shall be expressed in the title. But if any subject shall be embraced in an act which shall not be expressed in the title, such act shall be void only as to so much thereof as shall not be so expressed."

It is contended by plaintiff that the title is not broad enough to validate that part of the statute authorizing a city to engage in the selling of electricity to the inhabitants. However general an act may be, the legislative intention must be found in the body of the act, and if this goes beyond the language of the title, the act is invalid. See Sutter v. People's Gas Light & Coke Co., 284 Ill. 634, 120 N. E. 562.

But the Supreme Court of Illinois, in Springfield Gas Co. v. Springfield, 292 Ill. 236, 126 N. E. 739, 18 A. L. R. 929, held that the words "public utility" necessarily include only utilities which serve the public as well as the city, and that a municipally owned plant is not a public utility unless it serves the people as well as the city. For, as the court said, in State Public Utilities Commission v. Bethany Mut. Tel. Ass'n, 270 Ill. 183, 110 N. E. 334, 335, Ann. Cas. 1917B, 495: "Aside from the statutory definition, the term 'public utility' implies a public use, carrying with it the duty to serve the public and treat all persons alike, without discrimination, and it precludes the idea of service which is private in its nature, whether for the benefit and advantage of a few or of many." Consequently, the use of the words "public utility" in the title of the act carried with it sufficient significance to include all the subject-matter of the bill, including construction of a plant intended not only to furnish power to the city, but also to deliver power to the inhabitants.

The parties have raised a most interesting question as to the constitutionality of title 2 of the National Industrial Recovery Act under which the Administrator contracts with the city to grant a portion of the funds and to loan the balance thereof to the city. Plaintiff contends that the federal government is without power to appropriate money collected from general taxes by giving or loaning the same to local municipalities. On the other hand, defendants contend that such power is included under the powers to appropriate money raised by taxes levied, under the general welfare clause of the Constitution. Excellent briefs have been submitted, and learned counsel have presented in a most helpful manner the authorities bearing upon the question. But other courts have recently delivered extended opinions, the result obviously of intensive consideration, holding variously upon the issue. Typical of these are the opinion of Judge Watkins, holding the federal statute unconstitutional, in Duke Power Co. v. Greenwood County (D. C.) 10 F. Supp. 854, and that of Judge Otis, holding it constitutional, in Missouri Utilities Co. v. City of California (D. C.) 8 F. Supp. 454.

But, though the historical aspects of this question are deeply interesting, I do not find a decision thereof necessary to a correct disposition of this cause. I find in the record fatal defects in what has been done, invalidating the action of the city and the Administrator, regardless of any question under the United States Constitution. Consistently with the duty of a chancellor, I believe, I have based my decision upon what I find to be fatal defects under the state law and Constitution, irrespective of federal constitutional questions. These may with all safety be left to the courts of review. In this position I find support in the language of Cooley in his work on Constitutional Limitations, vol. I, c. VII, p. 338, in the following language: "Neither will a court, as a general rule, pass upon a constitutional question, and decide a statute to be invalid, unless a decision upon that very point becomes necessary to the determination of the cause. While courts cannot shun the discussion of constitutional questions when fairly presented, they will not go out of their way to find such topics."

In its answer, the city includes a counterclaim and a prayer that plaintiff's

franchise be forfeited because, it says, plaintiff has been guilty of discrimination in rates and service.

Prior to the enactment of the Public Utilities Act, cities in Illinois had, by virtue of section 50 of the act upon commission form of government (Smith-Hurd Ann. St. Ill. c. 24, § 315), the right to fix rates and prescribe rules and regulations of public utilities. They were authorized to institute proceedings in court, seeking forfeiture of a franchise of a utility upon proof that it was guilty of such discrimination. Thereafter the Public Utility Act was passed, and by its terms, the Illinois Commerce Commission was given exclusive jurisdiction of all utilities in the state, other than municipally owned public utilities. It was endowed with exclusive authority to fix rates of, prescribe rules and regulations for, and to have general supervision over all public utilities, with the exception noted. Remedies were created for those who might desire to complain of illegal acts upon the part of the utilities.

Interpreting these two acts, the Supreme Court of Illinois has several times held that the Public Utilities Act superseded entirely the powers previously vested in municipalities, relating to rules, regulations, service, discrimination in rates, and all similar matters.

In Chicago Coach Co. v. City of Chicago, 337 Ill. 200, 169 N. E. 22, 26, 66 A. L. R. 834, the court said: "The language of the act is sufficiently comprehensive to subject every phase of the relations between every public utility and the public to the supervision and regulation of the Public Utilities Commission. * * * These provisions certainly covered the whole field of service of every utility. They left no room for the exercise of authority of any other body. The vesting of the power conferred by this act in the Public Utilities Commission necessarily withdrew from cities and villages all such power as they had previously been authorized to exercise in the premises. * * * The right given to the city to complain to the commission concerning the services of public utilities within the city, the requirement of notice to the city of any hearing relating to the rates or charges for services of public utilities within the city, the right to appear and present evidence upon such hearing and the right of appeal from the order entered, certainly indicated that the Commerce Commission had plenary power over the utility, the conduct of its business and its relations to the public and that no power to exercise any control remained in the city. * * * By the creation of the Illinois Commerce Commission, with the comprehensive powers over public utilities which have been mentioned, the Legislature withdrew from municipalities in the state the power which they had previously exercised in regard to the use of the streets by such utilities and conferred those powers on the Commerce Commission." To the same effect are City of Altamont v. Baltimore & O. R. Co., 348 Ill. 339, 341, 180 N. E. 809; Village of Atwood v. Cincinnati, I. & W. R. Co., 316 Ill. 425, 431, 147 N. E. 449; Chicago, North Shore & M. R. Co. v. City of Chicago, 331 Ill. 360, 368, 371, 163 N. E. 141.

It follows that the motion to strike the counterclaim and prayer for affirmative relief must be allowed. I do not hold that a public utility company has a right to occupy the streets of the city without a franchise from the city; that question is not involved. This plaintiff has such a franchise, and it is conceded for the purpose of disposition of this motion that the city has a right to forfeit the same in accordance with the terms thereof for any violation of any provision thereof, jurisdiction over which has not passed to the Commerce Commission under the Public Utilities Act (Smith-Hurd Ann. St. Ill. c. 111⅔, § 1 et seq.). I hold merely that the power to forfeit a franchise by legal proceedings, for discrimination in rates, is no longer vested in the city; the remedy of the city now is prescribed by the Public Utilities Act. It may complain before the Commission. That body is endowed with jurisdiction to hear and decide the complaint, and the statute makes adequate provision for review of the decision. The motion is allowed and the counterclaim and prayer for affirmative relief are stricken.

Decree conforming with this memorandum may be submitted.